No. 23-20424

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

Georgia Firefighters' Pension Fund,

                Plaintiff-Appellee,

Norfolk City Council as Administering
Authority of the Norfolk Pension Fund;
Iron Workers Local 580 Joint Funds;
Building Trades United Pension Trust
Fund,

                Movants-Appellees,

        v.

Anadarko Petroleum Corporation; Robert
G. Gwin; Robert P. Daniels; Ernest A.
Leyendecker, III; R.A. Walker,

                Defendants-Appellants.

---

Appeal from the United States District Court for the Southern District
of Texas,
Docket No. 4:20-CV-576.
Honorable Charles R. Eskridge, III

---

BRIEF OF DEFENDANTS-APPELLANTS

***Cravath, Swaine & Moore LLP***
Kevin J. Orsini
Lauren M. Rosenberg
825 8th Avenue
New York, NY 10019

***Shipley Snell Montgomery LLP***
George T. Shipley
712 Main Street, Suite 1400
Houston, TX 77002

*Counsel for Defendants-Appellants*

# CERTIFICATE OF INTERESTED PERSONS

*In re Anadarko Petroleum Corporation Securities Litigation*, No. 23-20424.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. Plaintiffs-Appellees and Class: All persons or entities that purchased or otherwise acquired Anadarko Petroleum Corporation's publicly traded common stock between February 20, 2015 and May 2, 2017, inclusive, and were damaged thereby; Norfolk County Council as Administering Authority of the Norfolk Pension Fund; Iron Workers Local #580 Joint Funds; Building Trades United Pension Trust Fund.

2. Counsel for Class Plaintiffs-Appellees: Robbins Geller Rudman & Dowd LLP, 655 West Broadway, Suite 1900, San Diego, California 92101 (Mark Solomon, Daniel Drosman, Rachel Jensen, Luke Brooks, Hillary Stakem, Joseph David Daley); Kendall Law Group, PLLC, 3811 Turtle Creek Blvd., Suite 1450, Dallas, Texas 75219 (Joe Kendall); Ajamie LLP, 711 Louisiana, Suite 2150, Houston, TX 77002 (Thomas R. Ajamie).

3. Defendants-Appellants: Anadarko Petroleum Corporation, an indirect wholly owned subsidiary of Occidental Petroleum Corporation; R.A. Walker;

Robert G. Gwin; Robert P. Daniels; Ernest A. Leyendecker, III.

4.      Counsel for Defendants-Appellants:  Cravath, Swaine & Moore LLP, 825 Eighth Avenue, New York, New York 10019 (Kevin Orsini, Lauren Rosenberg); Shipley Snell Montgomery LLP, 712 Main Street, Suite 1400, Houston, Texas 77002 (George Shipley).

5.      Other Entities:  Insurers of Defendants-Appellants (National Union Fire Insurance Company of Pittsburgh, Pa., XL Specialty Insurance Company, Zurich American Insurance Company, U.S. Specialty Insurance Company, ACE American Insurance Company, American International Reinsurance Company, LTD., Freedom Specialty Insurance Company, RSUI Indemnity Company, Navigators Insurance Company, AXIS Insurance Company, QBE Insurance Corporation, Continental Casualty Company, Berkley Insurance Company, Beazley Insurance Company, Westchester Fire Insurance Company, Illinois National Insurance Company); Occidental Petroleum Corporation, a publicly held corporation that has no parent corporation.  Berkshire Hathaway Inc. indirectly owns 10% or more of the issued and outstanding shares of common stock of Occidental Petroleum Corporation.  No other publicly traded company owns more than 10% of the common stock of Occidental Petroleum Corporation.

Dated:  October 25, 2023

*/s/ Kevin J. Orsini*
Kevin J. Orsini

**STATEMENT REGARDING ORAL ARGUMENT**

This case presents an important question about class certification in the context of a securities fraud action, namely, whether district courts may rely on evidence presented for the first time by securities fraud plaintiffs in their class certification reply briefs while refusing to allow defendants an opportunity to present evidence in response. Given the burden-shifting framework that *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), imposes on the presumption of class-wide reliance, this likely will become a recurring question, particularly in light of the Supreme Court's instruction in *Goldman Sachs Group v. Arkansas Teacher Retirement System*, 141 S. Ct. 1951, 1960 (2021), that "all probative evidence" should be considered in evaluating class-wide reliance. In this case, the District Court erred when it failed to consider Defendants' evidence in response to new expert opinions submitted by Plaintiffs for the first time on reply but then explicitly relied on those new opinions in certifying the class. The error was compounded when the District Court refused to engage with Defendants' *Daubert* challenge of those expert opinions and analyses, in contravention of this Court's mandate in *Prantil v. Arkema Inc.*, 986 F.3d 570 (5th Cir. 2021). Defendants Anadarko Petroleum Corporation ("Anadarko"); Robert G. Gwin; Robert P. Daniels; Ernest A. Leyendecker, III; and R.A. Walker respectfully suggest that oral argument will assist the Court in resolving these questions.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ............................................................i

STATEMENT REGARDING ORAL ARGUMENT ........................................... iii

TABLE OF AUTHORITIES ...................................................................vi

JURISDICTIONAL STATEMENT ...........................................................1

ISSUES PRESENTED...........................................................................1

INTRODUCTION ...............................................................................2

STATEMENT OF THE CASE.................................................................5

I.     Relevant Facts...........................................................................5

       A.     The Putative Class and Alleged Corrective Disclosure .......................5

       B.     The Shenandoah Appraisal Project .......................................7

II.    Relevant Procedural History..........................................................10

       A.     Plaintiffs Move for Class Certification, Invoking the *Basic*
              Presumption of Reliance. ....................................................10

       B.     Defendants Present Evidence Demonstrating a Lack of Price
              Impact, Thereby Rebutting the *Basic* Presumption. ...........................11

       C.     Plaintiffs Submit New Price Impact Evidence on Reply. ...................15

       D.     The District Court Denies Defendants' Motion for Leave to File
              a Sur-Reply to Respond to Plaintiffs' New Price Impact
              Evidence. ....................................................................16

       E.     The District Court Fails to Meaningfully Engage with
              Defendants' *Daubert* Arguments. ........................................17

       F.     The District Court Certifies the Class and Relies Explicitly on
              Plaintiffs' New Arguments and Analyses on Reply. ..........................19

G.     The District Court Denies Defendants' Motion for Reconsideration. ...................................................................21

SUMMARY OF ARGUMENT ...........................................................23

STANDARD OF REVIEW ................................................................24

ARGUMENT ......................................................................................25

I.     The District Court Abused Its Discretion in Certifying the Class Without Considering "All Probative Evidence" on Class-wide Reliance. ...........................................................................................25

    A.     The District Court Abused Its Discretion by Relying on Evidence Presented by Plaintiffs for the First Time on Reply While Denying Defendants an Opportunity To Respond. .................27

    B.     The District Court Relied on Plaintiffs' Reply Evidence While Refusing to Consider Defendants' Responsive Evidence..................32

II.    The District Court Abused Its Discretion in Certifying the Class Because Defendants Rebutted Price Impact....................................35

    A.     Defendants Rebutted the *Basic* Presumption by Demonstrating a Lack of Price Impact.........................................................................36

    B.     The District Court Abused Its Discretion in Denying Defendants' *Daubert* Motion of Plaintiffs' Reply Expert Opinions. ..........................................................................................40

    C.     The District Court Abused Its Discretion in Finding that Anadarko Did Not Rebut the *Basic* Presumption. .............................45

CONCLUSION ...................................................................................53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Austin v. Kroger Tex., L.P.*, 864 F.3d 326 (5th Cir. 2017) ...............................31, 35

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ...................................................................2

*Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159 (10th Cir. 1998)..............................28

*Califano v. Yamasaki*, 442 U.S. 682 (1979) .........................................................26

*Chavez v. Plan Benefit Servs. Inc.*, 957 F.3d 542 (5th Cir. 2020)....................26, 29

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ....................................................28

*Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240 (5th Cir. 2020)....................25

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ..................17

*Edgar v. Anadarko Petroleum Corp.*, No. 4:17-cv-1372 (S.D. Tex. filed May 3, 2017).........................................................................7, 37

*Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton I")*, 718 F.3d 423 (5th Cir. 2013), *vacated and remanded*, 573 U.S. 258 (2014).........................................................................24, 25

*Esmark Apparel Co. v. James*, 10 F.3d 1156 (5th Cir. 1994)................................25

*Flecha v. Medicredit Inc.*, 946 F.3d 762 (5th Cir. 2020)........................................27

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ......................................................44

*Goldman Sachs Grp. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951 (2021) .............passim

*Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 573 U.S. 258 (2014)...........................................................................29, 40

*Ibe v. Jones*, 836 F.3d 516 (5th Cir. 2016) ...........................................................26

*In re BP p.l.c. Sec. Litig.*, No. 10-md-2185 (S.D. Tex. Nov. 8, 2013) ...................31

*In re Deepwater Horizon*, 824 F.3d 571 (5th Cir. 2016).........................................27

vi

*In re EQT Corp. Sec. Litig.*, No. 2:19-cv-00754-RJC (W.D. Pa. July 7, 2021), ECF 165 ...............................................................................30

*In re Goldman Sachs Grp, Inc., Sec. Litig.*, No. 10-cv-3461 (S.D.N.Y. June 8, 2015) ..................................................................................31

*In re Grupo Televisa Sec. Litig.*, No. 1:18-cv-01979 (S.D.N.Y. March 10, 2020) ..................................................................................30

*In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005 (C.D. Cal. 2003), *aff'd sub nom. Mortensen v. Snavely*, 145 F. App'x 218 (9th Cir. 2005) ....................................................43

*In re Mattel, Inc. Sec. Litig.*, No. 19-cv-10860 (C.D. Cal. Sept. 9, 2021) ..................................................................................30

*In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446 (S.D.N.Y. 2000) ..................................................................................43

*In re Oracle Sec. Litig.*, 829 F. Supp. 1176 (N.D. Cal. 1993) ................................43

*Johnson v. Arkema, Inc.*, 685 F.3d 452 (5th Cir. 2012).........................................44

*Madison v. Chalmette Refining, LLC*, 637 F.3d 551 (5th Cir. 2011) ....25, 26, 28, 35

*Prantil v. Arkema Inc.*, 986 F.3d 570 (5th Cir. 2021).....................................passim

*RedHawk Holdings Corp. v. Schreiber Tr. of Schreiber Living Tr.-DTD 2/8/95*, 836 F. App'x 232 (5th Cir. 2020)...................................4, 27, 33, 48

*Residents of Gordon Plaza, Inc. v. Cantrell*, 25 F.4th 288 (5th Cir. 2022) ..................................................................................4, 27

*St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*, No. 3:18-CV-00988, 2022 WL 4598044 (M.D. Tenn. Sept. 30, 2022).............................30

*Unger v. Amedisys, Inc.*, 401 F.3d 316 (5th Cir. 2005) ..........................................42

*United States v. Birdsell*, 775 F.2d 645 (5th Cir. 1985) .........................................28

*Vais Arms, Inc. v. Vais*, 383 F.3d 287 (5th Cir. 2004)............................................27

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)............................................26

**Statutes & Rules**

28 U.S.C. § 1331 ..............................................................1

Fed. R. Civ. P. 23 ......................................................passim

Fed. R. Civ. P. 23(a)........................................................26

Fed. R. Civ. P. 23(b) .......................................................26

Fed. R. Civ. P. 23(b)(3)...............................................passim

Fed. R. Civ. P. 23(f) ....................................................1, 22

Fed. R. Evid. 702 ............................................................17

# JURISDICTIONAL STATEMENT

The District Court has subject-matter jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under Federal Rule of Civil Procedure 23(f). This appeal is timely. A final order on class certification was entered on June 30, 2023. (ROA.10452-55.) On July 14, 2023, Defendants filed a petition for leave to appeal (No. 23-90022, ECF 2), which was granted on August 30, 2023 (ROA.10480-82).

# ISSUES PRESENTED

1. Whether the District Court abused its discretion in certifying the class by explicitly relying on evidence and arguments that Plaintiffs first submitted in their class certification reply brief while refusing to allow Defendants a sur-reply and otherwise refusing to consider contrary arguments and evidence properly submitted by Defendants.

2. Whether the District Court abused its discretion in certifying the class even though Defendants demonstrated that Anadarko's stock price decline was caused by a separate event and rebutted the factually and methodologically flawed price impact analysis proffered by Plaintiffs.

**INTRODUCTION**

The District Court repeatedly and explicitly refused—contrary to Supreme Court precedent—to consider "all probative evidence" on a motion for class certification in a securities fraud lawsuit. *Goldman Sachs Grp. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1960 (2021). In briefing class certification, Plaintiffs invoked the presumption of reliance on the integrity of the market set forth in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). *Basic* allows securities fraud plaintiffs to presume class-wide reliance by demonstrating that the stock at issue trades in an efficient market. *Basic* then permits a defendant to rebut the presumption of class-wide reliance by demonstrating that the alleged corrective disclosures had no impact on the stock price—referred to as "price impact" evidence.

Plaintiffs provided no evidence on price impact in their opening brief on class certification. In opposition, Defendants *did* present extensive evidence, including an expert report with multiple event studies, establishing that the alleged misstatements had no impact on Anadarko's stock price and that the stock decline at the center of Plaintiffs' case was in fact caused by an unrelated and unfortunate incident—the announcement that Anadarko was responsible for a home explosion in Firestone, Colorado, that killed two people and resulted in a state-wide regulatory investigation that threatened to halt Anadarko's gas production for an

indeterminate period of time.  On reply, Plaintiffs attempted to counter Defendants' evidence by submitting an entirely new expert report with new analyses and new opinions related to price impact.

The District Court then refused to allow Defendants to respond to Plaintiffs' new evidence and arguments, and did so no fewer than three times.  It first refused to grant Defendants leave to file a sur-reply on the erroneous premise that Plaintiffs had offered no new evidence on reply.  The District Court then refused to engage in a full-force analysis of Defendants' *Daubert* motion to exclude Plaintiffs' new price impact expert report.  This refusal was particularly remarkable because, in certifying the class, the District Court conceded that Plaintiffs' expert opinions on price impact—disclosed for the first time on reply—"certainly won't be immune from criticism" yet, without explanation, found them reliable enough for *Daubert* purposes.  Finally, the District Court explicitly refused to consider Defendants' responsive evidence on a motion for reconsideration.

Critically, the District Court explicitly relied on Plaintiffs' new expert evidence in reaching its certification decision while refusing to substantively consider the "probative evidence" that Defendants had offered in response and refusing to conduct the rigorous *Daubert* analysis this Court requires.  That was an abuse of discretion.  As this Court has recognized in other contexts, district courts abuse their discretion by relying on arguments raised for the first time in a reply

3

brief without first allowing the defendant an "adequate opportunity to respond." *Residents of Gordon Plaza, Inc. v. Cantrell*, 25 F.4th 288, 296 (5th Cir. 2022); *see also RedHawk Holdings Corp. v. Schreiber Tr. of Schreiber Living Tr.-DTD 2/8/95*, 836 F. App'x 232, 237 (5th Cir. 2020) (concluding the district court abused its discretion in relying on new evidence in reply after refusing leave to file a sur-reply). And as this Court recently made clear, a "full force" *Daubert* analysis must be conducted when a plaintiff's class certification expert opinions are challenged. *Prantil v. Arkema Inc.*, 986 F.3d 570, 576 (5th Cir. 2021). The failure to consider Defendants' responsive evidence is even more problematic in light of the Supreme Court's directive in *Goldman* that courts must consider *all* probative evidence in ruling on class certification. 141 S. Ct. at 1960. Taking these holdings together, a district court must allow defendants to respond to new evidence presented in class certification reply briefs—and must fully evaluate defendants' response—if the court intends to rely on the new evidence.

Although the Court could remand with an instruction that the District Court reconsider its decision in light of Defendants' responsive evidence, such a remand would be unnecessary and inefficient. The record demonstrates that the alleged misstatements had no price impact because Anadarko's stock drop was entirely the result of an unrelated catastrophic event. Therefore, the class was improperly

certified, and the District Court's order certifying the class under Rule 23(b)(3) should be reversed.

## STATEMENT OF THE CASE

### I. Relevant Facts

#### A. The Putative Class and Alleged Corrective Disclosure

Plaintiffs bring this putative securities fraud class action on behalf of purchasers of Anadarko common stock between February 20, 2015, and May 2, 2017, contending that Defendants made allegedly false or misleading statements regarding the commercial viability of a deepwater oil field in the Gulf of Mexico known as Shenandoah or "Shen." (ROA.1243-45, 2652.) According to Plaintiffs, the truth regarding the Shenandoah project—that the oil field was not commercially viable—was revealed after the stock market closed on May 2, 2017, when Anadarko announced that the sixth well drilled at Shenandoah ("Shen-6") had not encountered oil and that Anadarko had "suspended Shen operations, taken a $467 million impairment and expensed $435 million in suspended exploratory well costs." (ROA.2653.)

But that was not the only news concerning Anadarko that was released after the market closed on May 2. Shortly *before* Anadarko's disclosure about Shenandoah, at 4:03 p.m., major news broke during a press conference with Colorado fire officials that Anadarko's gas operations in Colorado were responsible for a home explosion that had killed two people in Firestone, Colorado

on April 17, 2017. (ROA.3485.) Indeed, that explosion previously had caused Anadarko to shut down 3,000 wells as a precautionary measure. (ROA.3046-47.) With the news that it was Anadarko's equipment that caused the explosion came an announcement from Colorado's governor ordering all oil and gas companies statewide to inspect and pressure-test all oil and gas flowlines within 1,000 feet of occupied buildings, which further extended Anadarko's well shutdown and led to significant regulatory uncertainty. (ROA.3046-47.) Anadarko, the largest oil and gas operator in Colorado at the time, issued a press release that evening committing to cooperate fully with regulators. (ROA.3046-47.)

The Firestone news made national headlines and the next day, May 3, 2017, Anadarko's stock price dropped around 8%. (ROA.3048.) Analysts attributed Anadarko's stock drop to the Firestone news and reported that the governor-mandated shutdown, future remediation efforts, and regulatory uncertainty had a disastrous impact on Anadarko's stock. (ROA.3073-74.) For example:

- *Bloomberg* published an article titled "Anadarko Shares Slide After Well Tied to Fatal Blast in Colorado," explaining that "Anadarko Petroleum Corp. tumbled the most in almost 16 months in New York trading, a day after Colorado officials linked one of the company's wells to a fatal house blast, opening questions on how the probe may play out." (ROA.3073.)

- *Reuters* reported in an article titled "Anadarko shares fall after home explosion linked to company well" that "[s]hares of Anadarko Petroleum Corp fell as much as 9.4 percent, a day after the cause of a fatal Colorado home explosion was linked by local fire protection

authorities to a nearby well operated by the oil and gas producer." (ROA.3073.)

- *Dow Jones* explained that "[s]hares of Anadarko Petroleum (APC) are tumbling this morning after releasing disappointing first-quarter earnings . . . but it's the potential overhang from a recent accident that appears to be spurring the massive selloff . . . . [T]he findings of the Firestone investigation are a clear negative for Anadarko." (ROA.3073-74.)

At least two investment banks downgraded Anadarko as a result of the Firestone fallout, and other oil and gas companies with meaningful Colorado operations also experienced statistically significant price declines that day. (ROA.3073-74.) *Wells Fargo* explained that "[o]ur downgrade follows what we believe will be an overhang on APC and all DJ Basin [*i.e.*, Colorado] players on the heels [of the] preliminary findings regarding the tragic situation in Firestone, CO." (ROA.3074.) Indeed, a separate securities class action lawsuit was filed against Anadarko related to the May 2 Firestone news, seeking damages associated with the exact stock decline at issue here. *Edgar v. Anadarko Petroleum Corp.*, No. 4:17-cv-1372 (S.D. Tex. filed May 3, 2017). In 2020, after that lawsuit was dismissed, Plaintiffs filed this action, claiming that it was the news about Shenandoah that caused Anadarko's stock drop on May 3.

B.   The Shenandoah Appraisal Project

The Shenandoah appraisal project was conducted from approximately 2008 to 2017, during which time Anadarko partnered with other oil and gas companies

(including ConocoPhillips and Cobalt International Energy) to appraise Shenandoah and determine whether the oil field could be commercially developed. (ROA.4301-12.) An appraisal project like Shenandoah involves drilling wells to determine the size and quality of the resource and the potential cost of development in order to determine whether to develop a prospective oil field. (ROA.4302.) A decision to develop a field like Shenandoah also depends on a variety of external factors, such as the price of oil. (ROA.4302.)

The Shenandoah partners drilled a total of six wells: a discovery well ("Shen-1"), which proved there was oil, and five appraisal wells ("Shen-2" through "Shen-6"). (ROA.4301-11.) ConocoPhillips and Anadarko had nearly identical working interests in Shenandoah, with Anadarko owning a 33% stake and ConocoPhillips owning a 30% stake. (ROA.3491-92.) Cobalt had a smaller stake of 20% and was in financial distress. (ROA. 3070, 3492-93.) While Anadarko was the operator responsible for planning and conducting drilling operations, each of the partners independently examined well results and decided whether to participate in drilling each subsequent well. (ROA.4301-02.) They also shared the associated costs, totaling several hundred million dollars for each company. (ROA.4304.)

Shen-2 encountered over 1,000 feet of oil, making it one of the largest discoveries in the Gulf of Mexico. (ROA.4302-03.) Subsequent appraisal wells

produced mixed results. (ROA.4304-12.) As Anadarko disclosed in its public filings, the oil and gas exploration and production industry is characterized by significant and inherent risks. (ROA.3044-45.) Long before the May 2, 2017 disclosure by Anadarko, several analysts assigned a "low to zero" value to Shenandoah because of this risk. (ROA.3077, 3491.)

After mixed results with Shen-3 and Shen-4, Anadarko told the public that the decision whether to develop Shenandoah would depend on the results of Shen-5 and Shen-6. (ROA.4304-08.) While Shen-5 encountered over 1,000 feet of oil, Shen-6 encountered no oil. (ROA.4308-10.)

In the morning of May 2, 2017, before markets opened, ConocoPhillips announced that Shen-6 did not encounter oil, reporting that the company's Q1 2017 numbers "were negatively impacted by $101 million of pre-tax dry hole expense, which includes the Shen-6 well in the Gulf of Mexico." (ROA.3067-68.) Later that day, after markets closed, Anadarko issued a quarterly report and press release at 4:16 p.m., stating that: (1) as ConocoPhillips had already announced that morning, Shen-6 did not encounter oil; and (2) Anadarko was suspending appraisal activity at Shenandoah and taking an accounting write-down in connection with Shenandoah, including $435 million in previously suspended costs and a $467 million impairment on the unproved property balance (the "May 2 Shen Disclosure"). (ROA.8445-46.)

Two days later, on May 4, 2017, after markets closed, ConocoPhillips announced that, as a result of Anadarko's "decision to impair the carrying value of Shenandoah," it had "recorded additional pre-tax dry hole expense of $242 million" and had "recorded a pre-tax expense of $51 million for leasehold impairment." (ROA.3071.) Notably, ConocoPhillips—which had a nearly identical stake in Shenandoah as Anadarko but had no significant operations in Colorado—did *not* experience a statistically significant price decline after its May 2 disclosure announcing that Shen-6 did not encounter oil, nor after Anadarko's after-hours May 2 Shen Disclosure announcing that it was suspending the Shenandoah operation, nor after its own May 4 disclosure announcing it was writing off Shenandoah expenses due to the suspension of appraisal activity. (ROA.3017-19, 3021-22, 3067-69, 3071-72.)

## II. Relevant Procedural History

In February 2020, Plaintiffs filed suit alleging that Defendants made false or misleading statements regarding Shenandoah's commercial viability that inflated Anadarko's stock price until the May 2 Shen Disclosure.

### A. Plaintiffs Move for Class Certification, Invoking the *Basic* Presumption of Reliance.

On October 1, 2021, Plaintiffs moved for class certification. (ROA.2643-72) They invoked the *Basic* presumption of reliance and argued that Anadarko's stock traded in an efficient market. *See Goldman*, 141 S. Ct. at 1958 (explaining

*Basic*'s requirements).  (ROA.2662-63.)  Plaintiffs proffered an expert report by

Bjorn Steinholt.  (ROA.2673-781)  Steinholt conducted an event study and opined

that Anadarko's common stock traded in an efficient market throughout the class

period.[1]  (ROA.2680-701)  As Steinholt explained in his report, his analysis was

conducted for the purpose of showing market efficiency; it was not conducted to

show that the alleged fraud impacted the company's stock price.  (ROA.2680.)  In

fact, Steinholt's report did not even mention the Firestone news released on May 2,

2017, and he conceded that his analysis would need to be modified "to properly

isolate the fraud-related component of the price movement" on May 3, 2017.

(ROA.2694.)  As Steinholt explained, he "did not perform a price impact analysis"

in his opening report, nor did he "draw a conclusion that the alleged corrective

disclosure is what caused the stock price to drop on May 3rd as opposed to any of

the other news, whether it be the guidance or the Colorado fire."  (ROA.3298-99,

3172:20-3173:3.)

> ### B. Defendants Present Evidence Demonstrating a Lack of Price Impact, Thereby Rebutting the *Basic* Presumption.

Defendants rebutted the *Basic* presumption in their opposition to class

certification by showing that the May 2 Shen Disclosure did not impact

---

[1] Steinholt's report also opined that damages in this case can be calculated on a class-wide basis.  (ROA.2701-04.)

Anadarko's stock price—the competing Firestone news release did.  (ROA.3004-34.)  In support of their position, Defendants submitted an expert report from Dr. Allen Ferrell, a Ph.D. economist and professor.  (ROA.3035-126.)

While Steinholt's event study identified that Anadarko's stock had a statistically significant decline on May 3, 2017, it did not identify *why* the stock declined, and Steinholt did not undertake any price impact analysis in his opening report.  Dr. Ferrell tested whether the Shenandoah disclosures impacted Anadarko's stock price by examining ConocoPhillips' stock price reaction on the dates of the Shenandoah disclosures.  (ROA.3048-50, 3055-56, 3066-76.)  That is because, given Anadarko's and ConocoPhillips' near-identical level of ownership in Shenandoah, new value-relevant Shenandoah information would have impacted both Anadarko and ConocoPhillips.  (ROA.3055.)  Dr. Ferrell found "no reliable economic evidence that the alleged corrective disclosures concerning Shenandoah had a price impact on Anadarko's stock."  (ROA.3066.)

*First*, Dr. Ferrell's expert report contained an event study demonstrating that even though ConocoPhillips announced that Shen-6 did not encounter any oil before the market opened on May 2, 2017, there was no statistically significant impact on the trading prices of any of the Shenandoah partners—ConocoPhillips, Anadarko, or Cobalt—during that entire trading day (when one would expect to see a price impact from such a disclosure in an efficient market).  (ROA.3067-68.)

12

As Dr. Ferrell explained, the lack of price impact from ConocoPhillips' pre-trading disclosure on May 2 provided direct evidence that the market did not react to the Shenandoah news even though Anadarko had long disclosed that any continued exploration of Shenandoah turned on what was found—or not found—by Shen-6. (ROA.3067-68.) This is because in the efficient market in which Anadarko's stock traded, new information about the Shenandoah project would "quickly and fully" be reflected in both partners' stock prices. (ROA.3051-52, 3068-69.)

*Second*, Dr. Ferrell's event study also demonstrated that ConocoPhillips' stock price still did not decline after Anadarko's post-trading May 2 Shen Disclosure, even though ConocoPhillips had a nearly identical working interest in Shenandoah. (ROA.3068-69.) Because Anadarko's May 2 Shen Disclosure was made after the market closed on May 2, any impact on ConocoPhillips' stock price would have been seen the following trading day, May 3. But ConocoPhillips' stock price did not have a statistically significant decline on May 3 either. (ROA.3068-69.) Dr. Ferrell explained that ConocoPhillips' stock price reaction was additional, compelling evidence that the new information related to Shenandoah had no price impact on Anadarko's stock because of the companies' nearly identical stakes in Shenandoah. (ROA.3055, 3068-69.)

*Third*, Dr. Ferrell demonstrated that ConocoPhillips' stock price also did not reflect any statistically significant decline even after ConocoPhillips announced

after markets closed on May 4 that it had written down additional dry-hole expenses and recorded a lease impairment due to the suspension of appraisal activity at Shenandoah. (ROA.3071-73.)

But Dr. Ferrell did not stop there—he established that the Firestone explosion news was what actually caused Anadarko's stock price decline. Dr. Ferrell conducted multiple event studies examining the impact of the May 2, 2017, Firestone news on four other oil and gas operators that, like Anadarko, had significant Colorado operations. (ROA.3073-76.) As Plaintiffs' own expert testified in his deposition, "changes to the regulatory environment" in Colorado—like those announced on May 2—"would not only impact Anadarko" but also "all the companies doing business in Colorado." (ROA.3074; ROA.3156:8-11.) That proved true, as Dr. Ferrell's event studies showed that, following the Firestone news, all four Colorado operators (in addition to Anadarko) experienced statistically significant stock price declines on May 3, 2017. (ROA.3074-75.) As none of those operators were involved in Shenandoah, the news about Shenandoah could not have impacted their stock prices.

These results, coupled with Dr. Ferrell's other event studies, conclusively demonstrated that it was the news related to the Firestone explosion and the resulting regulatory uncertainty in Colorado—not the May 2 Shen Disclosure— that impacted Anadarko's stock price on May 3, 2017. (ROA.3074-75.)

As noted above, that result is also consistent with the contemporaneous reports from financial analysts, one of whom explained that "[t]he findings of the Firestone investigation are a clear negative for Anadarko" and that "Colorado is already one of the most stringently regulated states in the nation in respect to energy and is likely to see increased pressure following this incident." (ROA.3046-47.) Another estimated that Anadarko could incur remediation costs of $140 million, and at least two investment banks downgraded Anadarko's rating in light of the Firestone news. (ROA.3073-74.)

### C. Plaintiffs Submit New Price Impact Evidence on Reply.

On reply, Plaintiffs raised entirely new arguments and presented an entirely new expert report from Steinholt—longer than his original report—and this time offered an analysis of price impact, including an entirely new event study. (ROA.3289-379.)

*First*, Steinholt analyzed—for the first time—the trading of Anadarko's stock during after-market hours to suggest that the stock price declined before the Firestone news broke. (ROA.3314-15.) Steinholt did not establish that Anadarko's stock traded efficiently in the after-hours market or even evaluate any of the market efficiency factors as they relate to the after-hours market. (*See* ROA.3483-84.) Nor did he conduct an event study to determine whether the after-hours price decline was statistically significant. (*See* ROA.3484-85.)

Additionally, Steinholt's after-hours analysis turned on his (factually erroneous) belief that the news about Firestone was released *after* the news about Shenandoah. (*See* ROA.3485.)

*Second*, Steinholt asserted that the magnitude of Anadarko's May 2 Shen Disclosure was itself determinative of price impact because the approximately $900 million write-down "demonstrates that Anadarko itself . . . had assigned a substantial economic value to the Shenandoah asset, which logically would have had some negative impact on Anadarko's stock price." (ROA.3294.)

*Third*, Steinholt conducted a new event study, purportedly controlling for the Firestone news by using a new "Colorado Peer Group." (ROA.3317-19.) Plaintiffs contend that Steinholt's new event study showed that the May 3, 2017, stock drop remained statistically significant even when supposedly controlling for Colorado-related news, and thus, that it could not have been the Firestone news that caused Anadarko's price decline on May 3. (ROA.3319.) In fact, however, this new event study did not include the industry index Steinholt had included in his opening market efficiency report—an index that was designed to control for industry-wide factors. (*See* ROA.3488-89.)

D.  The District Court Denies Defendants' Motion for Leave to File a Sur-Reply to Respond to Plaintiffs' New Price Impact Evidence.

Defendants moved for leave to file a sur-reply to address Plaintiffs' new evidence. (ROA.3380-88.) Defendants sought to show that Steinholt's new after-

hours analysis was not grounded in a reliable methodology as Steinholt had not evaluated whether the after-hours trading market was efficient to begin with; Steinholt's after-hours analysis was premised on demonstrably inaccurate facts because the Firestone news broke *before* Anadarko's May 2 Shen disclosure; Steinholt's new event study was based on a flawed and misleading methodology because it excluded the control group for the oil industry; and Steinholt's new opinions on price impact ignored basic finance theory. (ROA.3410-11.)

The District Court denied Defendants leave to file a sur-reply, leaving them with no opportunity to rebut Plaintiffs' new evidence. (ROA.3450-51.) The District Court stated counterfactually that Plaintiffs did not "introduce new arguments or evidence" in their reply—despite the lengthy expert report with new opinions and new analyses—and improperly concluded that "[a] surreply [was] therefore inappropriate." (ROA.3451.) The District Court held that "class certification [would] rise or fall with what is fairly briefed in the papers under the Local Rules of the Southern District of Texas." (ROA.3451.)

E.    The District Court Fails to Meaningfully Engage with Defendants' *Daubert* Arguments.

Defendants then moved to exclude Steinholt's new analyses under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702, on the basis that the new analyses were methodologically unsound and, thus, unreliable. (ROA.3452-75.) Supported by an expert report

17

from Dr. Ferrell (ROA.3480-503), Defendants showed that Steinholt's new expert report was unreliable for three reasons—none of which, as discussed below, the District Court addressed beyond commenting that Steinholt's new report was not "immune from criticism" (ROA.4080).

*First*, Steinholt's analysis of after-hours trading was unreliable as Steinholt did not show that Anadarko's stock traded efficiently during after-market hours. (ROA.3465-65, 3483-84.) Defendants also demonstrated that Steinholt's analysis was premised on the following critical *factual* error: contrary to Steinholt's timeline, the Firestone news was disseminated as early as 4:03 p.m.—*before* Anadarko's May 2 Shen Disclosure at 4:16 p.m., *not after* as Steinholt believed. (ROA.3467-68, 3485.)

*Second*, Steinholt's opinion that the Shenandoah write-down would "logically" have some impact on Anadarko's price was unreliable because the write-down involved sunk costs that would not have affected the stock price, as opposed to future cash flows. (ROA.3469-71, 3490-93.)

*Third*, Steinholt's new event study purporting to control for Firestone was unreliable because it involved a fundamental change in methodology that no longer controlled for industry-wide factors. (ROA.3468-69.) In his opening report, Steinholt had included an "index of Anadarko's peers to control for industry factors" that were not specific to Anadarko and, thus, unrelated to the alleged

fraud. (ROA.2694.) Yet Steinholt removed that industry index from his new event study. (ROA.3469.) When Dr. Ferrell analyzed Steinholt's new event study and incorporated Steinholt's prior industry index from his opening report, the results showed precisely the opposite of what Steinholt claimed in his reply report—contradicting Plaintiffs' argument that Steinholt's new event study "controlled" for Firestone. (ROA.3469, 3488-89) Moreover, Steinholt failed to account for the fact that Anadarko was the largest oil and gas operator in Colorado at the time and directly linked to the Firestone explosion—which had already led Anadarko to shut down over 3,000 wells and sustain associated losses—and thus the Firestone news affected Anadarko more than other Colorado operators. (ROA.3074, 3488-89.)

F.  The District Court Certifies the Class and Relies Explicitly on Plaintiffs' New Arguments and Analyses on Reply.

On September 28, 2022, the District Court entered an order denying Defendants' *Daubert* motion and granting Plaintiffs' motion for class certification. It did so without oral argument, even though the original scheduling order in the case scheduled argument on that motion. (ROA.2486-87.) And the District Court relied on new evidence Plaintiffs presented for the first time in their reply briefing, citing Steinholt's reply report no fewer than six times. (ROA.4084-87.)

Specifically, finding that Plaintiffs satisfied the predominance requirement of Rule 23(b)(3), the District Court rejected Defendants' arguments that Anadarko's May 2 Shen Disclosure had no impact on Anadarko's stock price. The

District Court discredited Defendants' argument that ConocoPhillips' stock price reaction to Anadarko's May 2 Shen Disclosure was evidence that the alleged fraud had no price impact on Anadarko's stock. Instead, the District Court suggested that ConocoPhillips' and Anadarko's May 2 disclosures about Shenandoah were different because, in the District Court's view, ConocoPhillips' disclosure of a $101 million expense was that company's entire "stake" in the project (when, in fact, that expense related to Shen-6 only) and this expense "paled in comparison to the $902 million stake held by Anadarko." (ROA.4086.) The District Court further noted that "other Shen development partners," referring to Cobalt, had "major price drops." (ROA.4086.) Finally, in rejecting Defendants' argument that the Firestone news caused the drop, the District Court cited exclusively to Steinholt's new event study and analysis of after-hours trading (which Plaintiffs had disclosed for the first time in their reply briefing). (ROA.4086-87.)

In the same order, the District Court denied Defendants' *Daubert* motion, stating that it was "little more than an attempt to re-urge Defendants' recently denied motion for leave to file a surreply." (ROA.4080.) The District Court acknowledged that Defendants had argued Steinholt's reply report was "rife with methodological errors" and noted that Steinholt's new event study was "certainly [not] immune from criticism." (ROA.4080.) But rather than meaningfully engage

with that criticism, the District Court concluded without explanation that "it's of sufficient reliability and relevance for *Daubert* purposes."  (ROA.4080.)

G.    The District Court Denies Defendants' Motion for Reconsideration.

On October 12, 2022, Defendants moved for reconsideration of the Order. (ROA.4095-111.)  Defendants argued that the District Court erred by, among other things, disregarding the lack of price impact from ConocoPhillips' May 2 disclosure and concluding that ConocoPhillips was not a proper comparator on the basis that its nearly identical interest in the Shenandoah project somehow amounted to a different "stake" in the project than Anadarko.  (ROA.4102-04.) The District Court instead improperly compared Anadarko to Cobalt, which had only 1/189th the market capitalization of Anadarko and was in financial distress.[2] (ROA.3070-71, 4104.)  Defendants also explained that the District Court erred in relying on Steinholt's unreliable analysis of after-hours trading and methodologically flawed event study for the reasons described in Defendants' *Daubert* motion—criticisms the District Court did not engage with in either its denial of Defendants' *Daubert* motion or its grant of class certification. (ROA.4104-06.)

---

[2] Both ConocoPhillips and Anadarko had much larger market capitalizations than Cobalt—ConocoPhillips had a market cap of $57.8 billion and Anadarko had a market cap of $31.4 billion, while Cobalt's market cap was $167 million. (ROA.3070, 3491-93.)

On June 30, 2023, the District Court denied Defendants' motion for reconsideration, emphasizing that many of Defendants' arguments "derive from information presented in the *Daubert* briefing, with express determination that such would *not* be properly considered." (ROA.10453.) The District Court thus confirmed that in certifying the class, it did not—and would not—substantively address Defendants' evidence and arguments presented in response to the new evidence and arguments that Plaintiffs had presented for the first time in their class certification reply brief.

The District Court rejected Defendants' argument that Cobalt was not an appropriate comparator for the additional reason that Defendants mentioned Cobalt only in a footnote in their opposition to class certification. (ROA.10453-54.) The District Court also "clarifi[ed]" that ConocoPhillips was not a proper comparator because ConocoPhillips' $101 million expense related to Shen-6 was 0.2% of its market capitalization, whereas Anadarko's $902 million write-down was 2.9% of its market capitalization. (ROA.10454.)

On July 14, 2023, Defendants filed a petition asking this Court to certify their Rule 23(f) appeal as to the District Court's finding that Plaintiffs established class-wide reliance under Rule 23(b)(3). On August 30, 2023, this Court granted Defendants' petition and certified the appeal.

## SUMMARY OF ARGUMENT

The District Court abused its discretion in certifying the class for two reasons: it denied Defendants the opportunity to respond to Plaintiffs' new evidence presented for the first time on reply, and refused to analyze "all probative evidence" presented by Defendants (including Defendants' *Daubert* challenge to Plaintiffs' new expert evidence) that, when properly considered, rebuts price impact.

*First*, the District Court abused its discretion by refusing—on three different occasions—to consider material evidence and arguments offered by Defendants in response to the new expert analyses and arguments that Plaintiffs first presented in their class certification reply briefing. This Court has repeatedly held that a district court abuses its discretion when it relies upon evidence presented for the first time on reply without allowing the non-moving party an adequate opportunity to respond. This is a particular problem in the context of class certification, as the Supreme Court has required courts to consider "all probative evidence" on the issue of class-wide predominance under Rule 23(b)(3). *Goldman*, 141 S. Ct. at 1960. To give effect to *Goldman*'s mandate, and ensure that district courts conduct the rigorous analysis required under Rule 23, this Court should make clear that a district court faced with new price impact evidence presented for the first time on reply must either disregard such new evidence or allow the defendant an

opportunity to respond.  (*See infra* Section I.A.)  Here, the District Court took a third, improper approach:  it explicitly relied on evidence presented for the first time on reply and repeatedly refused to consider probative evidence that Defendants proffered in response.  (*See infra* Section I.B.)

*Second*, when "all probative evidence" is considered, the record clearly demonstrates that the District Court abused its discretion in certifying the class.  Defendants' price impact evidence showed both that the May 2 Shen Disclosure had no impact on Anadarko's stock price and that the Firestone news caused the decline in the company's stock price.  (*See infra* Section II.A.)  Plaintiffs' evidence on reply did nothing to rebut these showings.  Rather, Plaintiffs' new expert analyses and arguments—on which the District Court relied in certifying the class after failing to properly evaluate Defendants' *Daubert* challenges—were based on flawed methodologies and inaccurate information.  (*See infra* Section II.B.)  The District Court's certification order ignored these flaws and rested on a fundamental misunderstanding of the facts and expert analyses.  (*See infra* Section II.C.)

For each of these reasons, the District Court abused its discretion in certifying the class, and the certification order should be reversed.

## STANDARD OF REVIEW

The Fifth Circuit reviews the District Court's class certification decision for abuse of discretion.  *Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton I")*,

718 F.3d 423, 427 (5th Cir. 2013), *vacated and remanded on other grounds*, 573 U.S. 258 (2014). "While the district court has substantial discretion to grant or deny certification, it 'must conduct a rigorous analysis of the [R]ule 23 prerequisites before certifying a class.'" *Id.* (citation omitted). "A district court abuses its discretion if it bases its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Esmark Apparel Co. v. James*, 10 F.3d 1156, 1163 (5th Cir. 1994). In other words, while the decision to certify a class is within the discretion of the district court, "that discretion must be exercised within the framework of [R]ule 23." *Madison v. Chalmette Refining, LLC*, 637 F.3d 551, 554 (5th Cir. 2011) (citation omitted). "[I]f the district court has committed legal error in the predominance inquiry, reversal is required." *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 249 (5th Cir. 2020) (citation omitted).

## ARGUMENT

I. **The District Court Abused Its Discretion in Certifying the Class Without Considering "All Probative Evidence" on Class-wide Reliance.**

The District Court abused its discretion under Rule 23 by denying Defendants the opportunity to respond to new evidence Plaintiffs offered for the first time in their reply briefing, thereby failing to consider all probative evidence and denying Defendants the ability to fully brief arguments as to which they carried the burden of persuasion.

"Rule 23 governs whether a proposed class falls within the limited exception to 'the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Ibe v. Jones*, 836 F.3d 516, 528 (5th Cir. 2016) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rather, "[t]he party seeking class certification bears the burden of demonstrating that the requirements of Rule 23 have been met." *Ibe*, 836 F.3d at 528 (citation omitted); *Madison*, 637 F.3d at 554-55.

In addition to satisfying the four prerequisites of Rule 23(a)—numerosity, commonality, typicality, and adequacy—plaintiffs must show that certification is appropriate under one of the subdivisions of Rule 23(b). As relevant here, a party seeking certification of a damages class under Rule 23(b)(3) must "clear the predominance hurdle" by demonstrating that "'questions of law or fact common to class members predominate over any questions affecting only individual members.'" *Madison*, 637 F.3d at 555 (quoting Fed. R. Civ. P. 23(b)(3)).

In evaluating whether plaintiffs have satisfied the applicable requirements to certify a class, a district court must "rigorously consider" the Rule 23 requirements. *Chavez v. Plan Benefit Servs. Inc.*, 957 F.3d 542, 546 (5th Cir. 2020). This analysis requires looking beyond the pleadings to "understand the

claims, defenses, relevant facts, and applicable substantive law." *Flecha v.*

*Medicredit Inc.*, 946 F.3d 762, 766 (5th Cir. 2020).

A.   The District Court Abused Its Discretion by Relying on Evidence
      Presented by Plaintiffs for the First Time on Reply While Denying
      Defendants an Opportunity To Respond.

Under the Supreme Court's and this Court's precedents, a district court

faced with new evidence and arguments submitted for the first time in a plaintiff's

reply in support of class certification must allow the defendant to respond if the

court intends to rely on the new evidence and arguments.

Three lines of precedent are at play here.   *First*, this Court has made clear

that "a district court abuses its discretion when it considers new arguments raised

for the first time in a reply brief without providing the 'non-movant an adequate

opportunity to respond prior to a ruling.'"   *Residents of Gordon Plaza, Inc.*,

25 F.4th at 296 (citation omitted); *see also RedHawk*, 836 F. App'x at 237 (finding

the district court abused its discretion in relying on new evidence in reply after

refusing leave to file a sur-reply); *In re Deepwater Horizon*, 824 F.3d 571, 585 n.8

(5th Cir. 2016) (holding an argument raised only in reply "is not properly before

the court"); *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 292 (5th Cir. 2004) (noting that,

in granting summary judgment, a district court may "rely on arguments and

evidence presented for the first time in a reply brief" only if it "give[s] the non-

movant an adequate opportunity to respond prior to a ruling"); *United States v.*

*Birdsell*, 775 F.2d 645, 655 n.4 (5th Cir. 1985) (noting that "[b]ecause the government ha[d] not had an opportunity to respond" to appellant's argument raised for the first time on reply, this Court would not "address the issue").  That is, when a district court is faced with new evidence and new arguments presented for the first time on reply, it must either disregard that evidence or allow the other party a fair opportunity to respond before relying on it in deciding the issue at hand.  *See Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1164-65 (10th Cir. 1998).

*Second*, in assessing class certification, the Supreme Court directs that "courts should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense."  *Goldman*, 141 S. Ct. at 1960 (citation and internal quotation marks omitted).  This includes, as necessary, an "inquiry into the merits," *id.* at 1961 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)), while "conduct[ing] a rigorous analysis of Rule 23 prerequisites," *Madison*, 637 F.3d at 554 (citation omitted); *accord Prantil*, 986 F.3d at 574.  District courts should not engage in a "figure-it-out-as-we-go-along" approach in which courts defer questions relevant to the class certification decision to a later stage.  *Prantil*, 986 F.3d at 578.  That is because class certification is often outcome-determinative.  "[C]ertification changes the risks of litigation often in dramatic fashion," *id.* at 575, and "can coerce a

defendant into settling on highly disadvantageous terms regardless of the merits of the suit," *Chavez*, 957 F.3d at 547 (citation omitted).

*Third*, in securities fraud cases, plaintiffs may show class-wide reliance to satisfy Rule 23(b)(3)'s predominance requirement by invoking the *Basic* presumption, which shifts the burden of persuasion to the defendant. "To invoke the *Basic* presumption, a plaintiff must prove: (1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed." *Goldman*, 141 S. Ct. at 1958 (citation omitted). The burden then shifts to the defendant to rebut the *Basic* presumption by showing "that an alleged misrepresentation did not actually affect the market price of the stock." *Id.* at 1959 (quoting *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 573 U.S. 258, 284 (2014)). This is because, absent price impact, "*Basic*'s fundamental premise completely collapses, rendering class certification inappropriate." *Id.* (citation omitted).

Together, these lines of cases mandate that, before a district court can rely on new price impact evidence and arguments that a plaintiff submits in a class certification reply, it must allow the defendant to respond. As a result of *Basic*'s burden-shifting framework, securities fraud plaintiffs often present nothing more than a bare-bones opening brief and report addressing whether the relevant security

trades in an efficient market. Plaintiffs, as they did here, often hold back any material analysis on price impact until their reply briefs and reply expert declarations. Defendants' submission of price impact evidence and arguments is in effect the opening evidence and briefing on that issue. Unless the district court allows defendants an opportunity to respond to plaintiffs' price impact evidence and arguments (for example, by filing a sur-reply or holding a hearing), plaintiffs' price impact arguments are submitted to the district court without the defendant ever having an opportunity to respond, rendering the district court's job to examine "*all* probative evidence" difficult, if not impossible. *Id.* at 1960.

Because such an approach does not permit the district court a reasonable opportunity to consider all of the probative evidence, many courts routinely grant sur-replies on class certification. *See, e.g.*, *St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*, No. 3:18-CV-00988, 2022 WL 4598044, at *1 (M.D. Tenn. Sept. 30, 2022) (permitting defendants to file sur-reply to class certification motion and plaintiffs to file a response); *In re Mattel, Inc. Sec. Litig.*, No. 19-cv-10860 (C.D. Cal. Sept. 9, 2021), ECFs 131, 133 (granting sur-reply in light of new arguments, expert opinions and evidence regarding price impact); *In re EQT Corp. Sec. Litig.*, No. 2:19-cv-00754-RJC (W.D. Pa. July 7, 2021), ECF 165 (granting sur-reply to respond to new opinions in plaintiffs' rebuttal expert report); *In re Grupo Televisa Sec. Litig.*, No. 1:18-cv-01979 (S.D.N.Y. Mar. 10,

2020), ECF 103 (granting sur-reply and supporting expert reports to address new price impact expert reports and affidavits); *In re Goldman Sachs Grp, Inc., Sec. Litig.*, No. 10-cv-3461 (S.D.N.Y. June 8, 2015), ECFs 156, 158 (granting sur-reply in light of new evidence); *In re BP p.l.c. Sec. Litig.*, No. 10-md-2185 (S.D. Tex. Nov. 8, 2013), ECFs 686, 687 (granting sur-reply in light of new damages methodologies and arguments); *see also Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 338 (5th Cir. 2017) ("The district court should also weigh the interests of justice when deciding whether to permit a surreply and allow the expert report to supplement the record.").

This Court need not rewrite the local rules and require that district courts allow sur-replies in *every* class certification motion presented to them. Nor does this Court need to strip district courts of their discretion in evaluating requests to file sur-replies. Instead, the problem raised by this appeal can be resolved simply by confirming that the rule this Court has established in other contexts, such as summary judgment briefing, also applies to class certification motions in securities fraud cases where a defendant seeks to rebut price impact: a district court may refuse to allow a sur-reply, but if it elects to do so, it cannot then rely on the new evidence presented on reply in deciding whether to certify the class.

B. **The District Court Relied on Plaintiffs' Reply Evidence While Refusing to Consider Defendants' Responsive Evidence.**

The District Court did not take either approach in this case. Instead, it explicitly relied on Plaintiffs' reply evidence while refusing to consider any response from Defendants. (ROA.4086-87.)

As an initial matter, the District Court's conclusion that a sur-reply was inappropriate because Plaintiffs' reply "didn't introduce new arguments or evidence" (ROA.3451) is flatly incorrect. Plaintiffs' reply included new arguments and a new expert report containing new analyses. Specifically, Plaintiffs' expert rendered new price impact opinions, including that (i) after-hours trading—which had not previously been examined by either party—showed that Anadarko's stock price reacted to the Shenandoah disclosure before the news about the fatal Firestone explosion broke, and (ii) his new event study—which was not part of his opening report—showed that the news released about the Firestone explosion did not impact Anadarko's stock price on May 3, 2017. (ROA.3305-09, 3314-15, 3317-19.) Indeed, Plaintiffs' expert *conceded* that these were new analyses, admitting that in his first report, he "did not perform a price impact analysis." (ROA.3301.)

The District Court's reasoning that it was appropriate to deny Defendants leave to file a sur-reply because, in its view, Defendants had chosen not to submit an event study on price impact in their opposition to class certification was also

incorrect.  (*See* ROA.3450-51.)  As discussed at length above, Defendants *did* submit an event study in opposition—several, in fact—that demonstrated the absence of price impact.  (*See* ROA.3056-59.)  What Defendants did not do—and could not have done—was *rebut* in their *opposition* the new expert event study and opinions that Plaintiffs first presented on *reply* because the District Court denied Defendants the opportunity.  *See RedHawk*, 836 F. App'x at 237 ("[T]he purpose of a response brief is to respond to the arguments made by the opposing party in its opening brief, not to rebut new arguments that party could conceivably make in its reply.").

The District Court compounded its error when it refused to address the criticisms of Steinholt's reply report that Defendants raised in their *Daubert* motion and accompanying expert report.  The District Court relied on its previous statement that it would decide class certification based on "what is fairly briefed in the papers under the Local Rules of the Southern District" and described Defendants' *Daubert* arguments as "little more than an attempt to re-urge Defendants' recently denied motion for leave to file a surreply."  (ROA.4080.) The District Court then acknowledged that Steinholt's "new event study certainly won't be immune from criticism," but decided, without any explanation, that the new event study was reliable enough for *Daubert* purposes.  (ROA.4080.)  The District Court then proceeded to grant class certification, expressly citing to

Steinholt's new event study and opinions without engaging at all with the "criticism" that already was before the Court in Defendants' *Daubert* motion.[3] (*See* ROA.4086-87.) This not only violated *Goldman*'s mandate to consider "all probative evidence" on price impact at the class certification stage. *Goldman*, 141 S. Ct. at 1960. It also violated this Court's explicit instruction that district courts should not use a "figure-it-out-as-we-go-along" approach, "deferr[ing]" "an assessment of the reliability of Plaintiffs' scientific evidence for certification," including in determining whether Rule 23(b)(3)'s predominance requirement is met. *Prantil*, 986 F.3d at 575-76, 578.

Finally, when afforded an additional chance to remedy the error it had made by refusing to consider probative evidence, the District Court again refused by denying the motion for reconsideration and dismissing most of Defendants' arguments because they "derive[d] from information presented in the *Daubert* briefing, *with express determination that such would not be properly considered. And as such, they will not be considered here*." (ROA.10453 (emphasis added).) The District Court refused to consider that information on reconsideration even though it recognized that it could "reconsider and revise its decision for any reason

---

[3] The District Court's class certification decision recognized that Plaintiffs' expert had submitted new analyses in his reply report, as the District Court even described it as a "new" event study. (ROA.4080.)

deemed sufficient," "even in the absence of new evidence or an intervening change in or clarification of the substantive law." (ROA.10452 (citing *Kroger Tex.*, 864 F.3d at 336).)

In sum, the District Court abused its discretion by expressly relying upon Plaintiff's new reply evidence while refusing to address the substantive criticisms that Defendants made addressed to that very evidence. This was a clear abuse of discretion. *See Madison*, 637 F.3d at 557 ("By failing to adequately analyze and balance the common issues against the individualized issues, the district court abused its discretion in determining that common issues predominated and in certifying the class.").

## II. The District Court Abused Its Discretion in Certifying the Class Because Defendants Rebutted Price Impact.

When all probative evidence is properly considered, including the flaws in Plaintiffs' expert evidence purporting to rebut Defendants' price impact arguments, it is clear that Anadarko's announcement about Shenandoah did not impact Anadarko's stock price on May 3, 2017—the catastrophic Firestone news and resulting regulatory scrutiny did. Plaintiffs' entire case is premised upon an approximately 8% stock drop on May 3, 2017, which they claim was caused, in part, by the Shenandoah news. (ROA.34-35.) But the evidence demonstrates that the Firestone news—not Anadarko's Shenandoah disclosures—caused Anadarko's stock price to decline.

A. Defendants Rebutted the *Basic* Presumption by Demonstrating a Lack of Price Impact.

Anadarko was the largest oil and gas operator in the State of Colorado. (ROA.3074-75.) After market hours on May 2, 2017, Anadarko was identified as the cause of a tragic home explosion in Firestone, Colorado that had killed two people and injured another. (ROA.3073-74) Before the cause of that explosion was identified, Anadarko shut down 3,000 wells as a precautionary measure, incurring the corresponding revenue losses. (ROA.3046-47.) Then, on the same day Anadarko was identified as the responsible party, Colorado's governor, as a result of the explosion, mandated enhanced regulatory scrutiny that would lead to additional shutdowns and cost the company an anticipated $140 million in remediation costs, in addition to the loss of revenue from the shut-down wells. (ROA.3046-47.) The Firestone news made national headlines, and analysts linked the news with Anadarko's May 3 stock drop, recognizing that the shutdown, time, and expense associated with future remediation efforts and regulatory uncertainty had a disastrous impact on Anadarko's stock:

- In an article titled "Anadarko shares fall after home explosion linked to company well," *Reuters* reported that Anadarko's shares fell "a day after the cause of a fatal Colorado home explosion was linked by local fire protection authorities to a nearby well operated by the oil and gas producer." (ROA.3073.)

- *Bloomberg* similarly reported, in an article captioned "Anadarko Shares Slide After Well Tied to Fatal Blast in Colorado," that Anadarko's stock "tumbled the most in almost 16 months in New

York trading, a day after Colorado officials linked one of the company's wells to a fatal house blast."  (ROA.3073.)

- *Dow Jones* reported, in a report titled "Why Anadarko Petroleum is Crumbling," that "it's the potential overhang from a recent accident that appears to be spurring the massive selloff" of Anadarko stock and that "[t]he findings of the Firestone investigation are a clear negative for Anadarko."  (ROA.3073-74.)

At least two investment banks downgraded Anadarko as a result, with *Wells Fargo* noting that its "downgrade follows what [it] believe[s] will be an overhang on APC [Anadarko] and all DJ Basin players on the heels [of] the preliminary findings regarding the tragic situation in Firestone, CO."  (ROA.3074.)  And a separate securities lawsuit filed against Anadarko sought damages associated with the exact stock decline at issue here, asserting that such decline was caused solely by the Firestone news.  *Edgar v. Anadarko Petroleum Corp.*, No. 4:17-cv-1372 (S.D. Tex. filed May 3, 2017).

That it was the news about Firestone—not Shenandoah—that impacted Anadarko's stock price is confirmed by the fact that the price of common stock of ConocoPhillips (a Shenandoah partner with an equity stake nearly the same size as Anadarko's) did not meaningfully decline on May 2, 2017 (after ConocoPhillips had disclosed that Shen-6 did not encounter oil and wrote-down certain expenses), on May 3, 2017 (after the after-hours news of Anadarko's May 2 Shen Disclosure), or on May 5, 2017 (after the after-hours news of ConocoPhillips' May 4 disclosure that, like Anadarko, it was writing down Shen because of the decision to suspend

Shen appraisal activity). (ROA.3067-73.) As Dr. Ferrell's event studies show, the suspension of Shenandoah appraisal activity and write-down would have affected ConocoPhillips, not just Anadarko, and there was no other news that might have affected ConocoPhillips' stock price on May 3, 2017. (ROA.3055, 3067-73.)

Accordingly, ConocoPhillips offers a compelling proxy for assessing the price impact of Anadarko's Shenandoah-related disclosures. (ROA.3055.) If (as Plaintiffs contend) Anadarko's alleged misrepresentations about Shenandoah had inflated its stock price, which was then corrected after market close on May 2, 2017, then ConocoPhillips' stock price should also have experienced a similar decline. It indisputably did not.

The lack of impact from the Shenandoah disclosure on Anadarko's stock is further backed by common sense. The oil and gas exploration and production industry is characterized by significant and inherent risks, which had been disclosed in Anadarko's public filings throughout the life of the appraisal project and were well known to investors. (ROA.3044-46, 3076-80.) By definition, appraisal wells like Shen-2 through Shen-6 are drilled to assess the commercial viability of the discovery; accordingly, the risk of an appraisal well not encountering oil can be substantial. (ROA.3076.) Indeed, analysts observed that the negative news about Shenandoah was "not completely unexpected." (ROA.3068.)

In fact, as Dr. Ferrell explains—and Plaintiffs' expert Steinholt does not contest—Shenandoah was a risky project to which several analysts assigned "low to zero" value throughout the class period. (ROA.3077; *see* ROA.3491.) Investors also viewed Anadarko's appraisal efforts at Shenandoah with caution and skepticism in light of low oil prices during the class period; this meant that the Shenandoah development and production was unlikely to be economically viable at or close to that time. (ROA.3077-78.) Numerous analysts also acknowledged that Anadarko would not approve Shenandoah for development until oil prices were significantly higher than they were during the class period. (ROA.3077-80.) Against this backdrop, and "aided by a good dose of common sense," *Goldman*, 141 S. Ct. at 1960, it is no surprise that Anadarko's announcement that it was suspending further appraisal of a risky deepwater project and taking an accounting write-down for certain associated costs did not impact the market's forecast for Anadarko's future revenues, and therefore, did not impact Anadarko's stock price.

Where, as here, a defendant demonstrates a lack of price impact from disclosure of the alleged fraud, the plaintiff cannot rely on the *Basic* presumption. Accordingly, reliance cannot be proven on a class-wide basis, and individual issues predominate, rendering certification under Rule 23(b)(3) inappropriate. *Goldman*, 141 S. Ct. at 1959; *Halliburton II*, 573 U.S. at 283. The District Court's reliance on a fully rebutted presumption to certify the class was an abuse of discretion.

B.   The District Court Abused Its Discretion in Denying Defendants'
     *Daubert* Motion of Plaintiffs' Reply Expert Opinions.

As this Court recently held, "the *Daubert* hurdle must be cleared when
scientific evidence is relevant to the decision to certify" a class.  *Prantil*, 986 F.3d
at 575.  This is because a class can be certified only if certification is "based on
adequate admissible evidence."  *Id.*  To ensure this is the case, a district court must
"conduct a 'rigorous analysis' of the proposed class's conformity with Rule 23."
*Id.* (citation omitted).  It is not enough that a district court "not disregard its gate-
keeping role"; its *Daubert* analysis of expert reports in support of class
certification must be conducted "with full force."  *Id.* at 576.

Here, the District Court abused its discretion when it refused to evaluate
Defendants' *Daubert* arguments "with full force," or, indeed, to address any of
Defendants' criticisms of Steinholt's reply report.  *See id.*  The District Court's
abdication of its responsibility under *Prantil* is evident in that (1) it viewed
Defendants' *Daubert* motion as nothing more than an attempt to assert arguments
that the court had previously refused to entertain when it denied Defendants leave
to file a sur-reply, and (2) the District Court recognized that Plaintiffs' new expert
report "won't be immune from criticism" yet failed to substantively address that
criticism and concluded, without explanation, that Steinholt's analysis was
nonetheless "of sufficient reliability and relevance for *Daubert* purposes."
(ROA.4080.)  The District Court then relied entirely on Steinholt's new report in

certifying the class.  (ROA.4086-87.)  The District Court's failure to conduct a

"full force" *Daubert* analysis led to a class certification decision based on flawed

expert opinions.

*First*, Steinholt's new after-hours market analysis—conducted for the first

time on reply—is methodologically flawed because Steinholt failed to establish

that the after-hours market for Anadarko stock is efficient.  As Steinholt himself

has explained, "[a]n efficient market is one that efficiently processes new and

material information . . .[,] quickly incorporat[ing] [that information] into the stock

price."  (ROA.2680-81.)  The result is that "[i]n an efficient market you can trust

prices" because the market is "expected to efficiently process new, material

information."  (ROA.2682-85.)  The corollary is that without a showing of market

efficiency, a securities fraud plaintiff cannot draw any reliable conclusion from

stock price movements—in other words, one cannot "trust prices."

In his opening report, Steinholt evaluated whether Anadarko's stock trades

efficiently *during market hours*.  (ROA.2685-701.)  But Steinholt did not evaluate

whether—let alone establish that— Anadarko's stock trades efficiently *after*

market hours.  This Court has made clear that "[w]ithout an initial demonstration

of market efficiency, there is no assurance that the available material information

concerning the stock translates into an effect on the market price and supports a

classwide presumption of reliance."  *Unger v. Amedisys, Inc.*, 401 F.3d 316, 322

(5th Cir. 2005). That Anadarko's stock traded in an efficient market during market hours does not establish that its after-hours trading was also efficient, particularly because after-hours trading involves fewer participants, thinner volume, wider bid-ask spreads, and higher volatility. (ROA.3483-84.) Without any showing that the after-hours market for Anadarko's stock was efficient during the class period, Steinholt's opinion on after-market-hours trading is fundamentally unreliable.

Additionally, even assuming one could rely on after-market-hours trading, Steinholt also failed to conduct an event study to assess whether the decline in Anadarko's stock in after-hours trading was statistically significant, *i.e.*, unlikely to have occurred simply by chance. (ROA.3484-85; *see* ROA.2694.) As Steinholt acknowledged in his opening report, an event study is generally necessary to determine whether a movement in stock price is statistically significant and to control for certain industry-wide factors that are unrelated to the alleged fraud. (ROA.2694-95.) In his reply report, Steinholt did not conduct an event study to determine whether the decline in Anadarko's stock price after market close on May 2, 2017, was statistically significant. (*See* ROA.3484-85.) With no event study analysis of Anadarko's after-hours trading, or adjustment for market and industry factors, the decline upon which Steinholt relies cannot be distinguished from mere chance. This too renders his after-hours opinions fatally deficient. *See In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 460 (S.D.N.Y. 2000)

(concluding "testimony is fatally deficient in that [expert] did not perform an event study or similar analysis to remove the effects on stock price of market and industry information"); *see also, e.g.*, *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1015-16 (C.D. Cal. 2003) (absent event study, plaintiff was unable to distinguish between fraud-related impact and non-fraud-related impact on defendant's stock price), *aff'd sub nom. Mortensen v. Snavely*, 145 F. App'x 218 (9th Cir. 2005); *In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1181 (N.D. Cal. 1993) (excluding plaintiff's expert's opinion and explaining that "[a]s a result of [expert's] failure to employ [an event or similar] study, the results . . . cannot be evaluated by standard measures of statistical significance" making "the reliability of the magnitude and direction of his value estimates . . . incapable of verification").

*Second*, Steinholt's after-hours market analysis does not fit the facts because Steinholt has the sequence of events wrong. Steinholt's analysis depends on the assumption that the May 2 Shen Disclosure was released before the Firestone news. (ROA.3314-15.) In fact, the opposite is true. Anadarko released its May 2 Shen Disclosure at 4:16 p.m. on May 2, 2017. (ROA.3485.) Firestone, Colorado fire officials held a press conference announcing the results of their investigation at 4:03 p.m., and reporters disseminated the information in real time prior to 4:16 p.m. (ROA.3485.) But Steinholt incorrectly claims that the Firestone news

was first released at 4:51 p.m.—*after* Anadarko's after-hours earnings announcement.  (ROA.3314-15.)  This factual error alone renders Steinholt's opinions based on after-hours trading wholly unreliable.  *See Johnson v. Arkema, Inc.*, 685 F.3d 452, 462 (5th Cir. 2012) (finding expert opinions properly excluded where the facts had no "direct correlation or 'fit'" with the opinion and, thus, there was "too great an analytical gap between the data and the opinion proffered" (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997))).

*Third*, Steinholt's new event study—the event study the District Court itself acknowledged was subject to criticism yet relied upon in certifying the class—is fatally flawed because it does not control for industry factors.  As Steinholt explained in his opening report, "[t]he event study first determines the statistical relationship between the stock price returns of the company and the returns on market and/or industry indices during a control period" and then "the actual stock price return on the event day analyzed is compared to the return predicted . . . , *i.e.*, the stock's return on the event day net of market and/or industry factors." (ROA.2694-95.)  And in the event study in his opening report, Steinholt used "an equally weighted index of Anadarko's peers to control for industry factors." (ROA.2694.)  Yet in his reply report, Steinholt added Colorado comparators to his new event study (purporting to control for the Firestone news), but inexplicably removed the industry index, thereby losing the ability to control for factors

affecting the industry.  (*See* ROA.3488-89.)  Steinholt offered no justification for this change, and when Dr. Ferrell re-applied that industry index, he demonstrated that Steinholt did not in fact control for Firestone.  (ROA.3488-89.)

      C.     The District Court Abused Its Discretion in Finding that Anadarko Did Not Rebut the *Basic* Presumption.

The District Court concluded that Defendants failed to rebut the *Basic* presumption for four reasons—all of which are based on Plaintiffs' unreliable expert report presented in their class certification reply:  (1) ConocoPhillips' disclosure on May 2, 2017 was different from Anadarko's after-hours disclosure that day, and thus ConocoPhillips' lack of a stock price decline does not disprove price impact; (2) ConocoPhillips is not a proper comparator to Anadarko because its stake in Shenandoah "paled in comparison" to Anadarko's; (3) Anadarko's stock price dropped after market hours on May 2 before the Firestone news broke and Steinholt's new event study showed the May 3 stock drop remained statistically significant when controlling for the Firestone news; and (4) "[c]ommon sense suggests" that Anadarko's stock drop could not be solely attributable to the Firestone news.  (ROA.4086-87.)  Because these are based on a flawed expert report—which itself is premised on factual inaccuracies and unreliable methodologies—none of these bases for class certification can stand.

1. *The District Court Erred in Concluding ConocoPhillips Was Not an Appropriate Comparator.*

The District Court's determination that Defendants did not rebut the *Basic* presumption is founded in part on its erroneous determination that ConocoPhillips is not a proper comparator to Anadarko. (ROA.4086.) Anadarko and ConocoPhillips had nearly equal ownership interests in the Shenandoah project, at 33% and 30%, respectively. (ROA.3055.) The District Court claimed that the Shenandoah project "was a minor expenditure relative to [ConocoPhillips'] massive market cap" and ConocoPhillips' "$101 million stake paled in comparison to the $902 million stake held by Anadarko." (ROA.4086.) The figures relied upon by the District Court did not reflect the companies' relative "stakes" in the Shenandoah project—which were nearly identical. Instead, those figures simply reflected the accounting treatment for certain sunk costs, such as the costs of the wells that already had been drilled. Sunk costs do not affect the value of the companies' future cash flows, so the differences between these figures would have had no impact on the companies' stock price reactions (or lack thereof). (ROA.3490-91.) What did affect the companies' future cash flows with respect to Shenandoah were the companies' working interests in the project. (ROA.3490-92.) Those interests were nearly identical (33% and 30%), and so the impact of Shen-related news on one company's stock would have had a similar impact on the other's. (ROA.3068-69.)

In its order on reconsideration, the District Court purported to "clarif[y]" its holding, finding that the companies were differently situated "given their respective market capitalizations," as "ConocoPhillips experienced a $101 million dry-hole expense, which represented 0.2% of its market capitalization, while Anadarko experienced a $902 million write-off, which represented 2.9% of its market capitalization." (ROA.10454.) This, again, misunderstands the facts. ConocoPhillips' $101 million expense related primarily to one appraisal well— Shen-6. (ROA.3067-68, 3491-93.) Anadarko's $902 million write-down related to the *entire* Shenandoah project (Shen-1 through Shen-6). (ROA.3046, 3489-93.) The two figures thus represent entirely different things, and their respective differing percentages of the companies' market capitalizations do nothing to suggest that ConocoPhillips is an improper comparator. Importantly, Anadarko had a market cap roughly half the size of ConocoPhillips. This means that if (as Plaintiffs contend) Anadarko's stock declined by 8% related to the Shenandoah disclosure, one would expect a roughly 4% decline of ConocoPhillips' stock given their near-identical ownership interests. But that did not occur at all, further demonstrating the price impact on Anadarko's stock was unrelated to Shenandoah.

As to Cobalt, the District Court noted that "other Shen development partners with high Shen-stake-to-market-cap ratios suffered major price drops on May 3rd." (ROA.4086.) But Cobalt is not a proper comparator. Cobalt had near-term

liquidity constraints and was at risk of being delisted from the New York Stock Exchange, and its ability to continue as a going concern would, only days later, be deemed in "substantial doubt." (ROA. 3070-71.) Cobalt's market cap was tiny relative to Anadarko—1/189th the size of Anadarko's. (ROA. 3070.) And as Defendants explained in their *Daubert* motion, even assuming for the sake of argument that Cobalt's entire market capitalization decline on May 3, 2017— $18.8 million—had been attributable to the Shenandoah news, the corresponding loss for Anadarko, with its larger stake in Shenandoah, would have been a mere $31 million. (ROA.3492-93.) As Dr. Ferrell explained in his second report (the report the District Court refused to consider) a loss in market capitalization of $31 million for Anadarko would result in only a 0.1% stock price decline, which would be statistically insignificant. (ROA.3492-93.)[4]

2. *ConocoPhillips' Lack of Price Decline Shows that Anadarko's Shenandoah Disclosures Had No Price Impact.*

The District Court reasoned that ConocoPhillips' May 2, 2017 disclosure that Shen-6 did not find oil was different from Anadarko's Shenandoah disclosure

---

[4] In its order on reconsideration, the District Court rejected Defendants' argument that Cobalt was not a proper comparator because Defendants mentioned Cobalt only in a footnote in their opposition. (ROA. 10453-54.) But Plaintiffs did not mention Cobalt, much less argue that Cobalt was relevant, until their reply, and Defendants could not have responded in opposition to an argument Plaintiffs had not yet made. *See RedHawk*, 836 F. App'x at 237.

that same day in that "ConocoPhillips didn't disclose the suspension of Shen appraisal activity, it didn't write-down Shen, and it didn't disclose Shen sidetrack well results." (ROA.4086.) While that is true, it misses the point.

All relevant information about Shenandoah *was* disclosed—either by ConocoPhillips or Anadarko—and had no price impact on ConocoPhillips. Before the market opened on May 2, ConocoPhillips disclosed that Shen-6 had not encountered oil and that it was writing down certain Shen expenses. (ROA.3067-68.) Neither Anadarko nor ConocoPhillips experienced a statistically significant price decline that day. (ROA.3067-68.) This lack of price impact on May 2 is important—Anadarko had disclosed, and analysts understood, that the results of Shen-6 would determine whether the oil field would be developed. (ROA.4308.) Yet when ConocoPhillips announced that Shen-6 encountered no oil, neither ConocoPhillips nor Anadarko saw a stock drop.

Anadarko's Shenandoah disclosures after the market closed on May 2—that it was suspending appraisal activity and writing down the project—similarly had no price impact. When trading resumed on May 3, investors were aware that the Shenandoah appraisal was being suspended and that the partners with the largest stakes in the project were writing down costs. But, again, ConocoPhillips' stock did not decline on May 3. (ROA.3069.) This undermines the District Court's finding that these additional disclosures by Anadarko impacted Anadarko's stock

price on May 3.  If these additional disclosures had impacted Anadarko's stock, ConocoPhillips' stock would have seen a decline as well.  (ROA.3068-69.)  This is because—contrary to the District Court's statement—ConocoPhillips (with a working interest of 30%) had a near-identical stake in Shenandoah to Anadarko (with a working interest of 33%).  (ROA.3055.)  Plaintiffs' methodology dictates that ConocoPhillips' stock—like Anadarko's—traded in an efficient market.  (ROA.3069.)  And as Steinholt acknowledges, efficient markets take into account all information relevant to stock price.  (ROA.2680-84.)  Therefore, applying Steinholt's own framework, when one of the Shenandoah partners disclosed information related to the project, that information would have been reflected in both Anadarko and ConocoPhillips' stock price.  But here, the entirety of Anadarko's May 2 Shen Disclosure had no price impact on ConocoPhillips' stock.  (ROA.3069.)

As further evidence of the lack of any price impact of the Shenandoah news, when ConocoPhillips disclosed on May 4, 2017 that it was writing down an additional $293 million related to Shenandoah (similar to the very disclosures Anadarko made on May 2), that too caused no statistically significant decline in the price of ConocoPhillips stock.  (ROA.3071-73.)  The District Court said nothing in its Order about these May 4 disclosures by ConocoPhillips.

### 3. *The Firestone News—Not the Shenandoah Disclosures— Impacted Anadarko's May 3 Stock Price.*

The District Court's other reasons for concluding that Defendants failed to rebut the *Basic* presumption rest on its erroneous conclusions regarding the impact of the May 2, 2017 Firestone news.

*First*, the District Court disregarded the factual inaccuracies and analytical flaws in Steinholt's new after-hours trading opinions when the District Court concluded that "a potential $140 million in new regulatory costs as a result of the Firestone news" did not demonstrate that the price decline on May 3, 2017 was the result of the Firestone explosion news because Anadarko's stock price "dropped 4.1 percent during after-hours trading between the time Anadarko made its Shen disclosures and the time the Firestone news broke." (ROA.4086-87.) As discussed above, this conclusion relies on wholly unreliable analyses. Steinholt failed to establish that the after-hours market for Anadarko's stock is efficient, despite acknowledging that a stock's price can be said to reflect all available information only if the market is efficient. (ROA.2680-81.) Steinholt's after-hours opinions are based on the wrong sequencing of events, as the Firestone news broke *before*, not after, Anadarko's Shenandoah disclosures. (*See* ROA.3485.) Steinholt also failed to conduct an event study to determine if the after-hours decline—the very decline the District Court cited—was statistically significant. (*See* ROA3484-85.)

*Second*, the District Court disregarded the methodological flaws in Steinholt's new event study when it concluded the Firestone news did not impact Anadarko's stock price because "the Steinholt event study concluded that the price drop on May 3rd remained statistically significant even when controlling for the Firestone news." (ROA.4087.) That event study inexplicably lacks the industry index that Steinholt touted in his opening market efficiency report as controlling for industry-wide (and non-fraud-related) factors. (ROA.2694.) As Dr. Ferrell demonstrated (in an analysis the District Court refused to engage with), when the industry index *is* included, Steinholt's new event study does not control for the Firestone news at all. (*See* ROA.3469, 3488-89.)

*Third*, the District Court erroneously found that "[c]ommon sense suggests here that, when news broke on the same day of both an *actual* $900 million write-off as well as a *potential* $140 million in new regulatory costs, an eight percent decline in the company's stock price the following day isn't *solely* attributable to the latter, lesser regulatory costs." (ROA.4087.) But this flies in the face of reports by analysts explicitly linking the Firestone news to Anadarko's May 3 stock drop. (ROA.3073-74.) And it ignores that other Colorado oil and gas companies, which were affected by the Firestone news and resulting regulatory uncertainty, *did* see statistically significant price declines (ROA.3073-75), while ConocoPhillips, which would have been impacted by the Shenandoah news, *did*

*not* (ROA.3055, 3067-68). Moreover, as the market recognized, the write-down represented an accounting of sunk costs—not a devaluation of future cash flows expected from Shenandoah. (ROA.3490-91.)

These facts, coupled with Defendants' other price impact evidence, carries Defendants' burden of persuasion and rebuts the *Basic* presumption of reliance.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court reverse the District Court's order granting class certification.

Dated: October 25, 2023

Respectfully submitted,

*/s/ Kevin J. Orsini*

**CRAVATH, SWAINE & MOORE LLP**
Kevin J. Orsini
Lauren Rosenberg
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
korsini@cravath.com
lrosenberg@cravath.com

**SHIPLEY SNELL MONTGOMERY LLP**
George T. Shipley
State Bar No. 18267100
Federal ID No. 02118
712 Main Street, Suite 1400
Houston, TX 77002
Telephone: (713) 652-5920
Facsimile: (713) 652-3057
gshipley@shipleysnell.com

*Counsel for Defendants-Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 25, 2023, I electronically filed the foregoing brief with the Clerk of Court using the appellate CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished via CM/ECF.

Dated: October 25, 2023

/s/ Kevin J. Orsini
Kevin J. Orsini
*Counsel for Defendants-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this document complies with Federal Rule of Appellate Procedure 32 because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 11,754 words. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Office Version 2208 in Times New Roman size 14.

Dated: October 25, 2023

*/s/ Kevin J. Orsini*
Kevin J. Orsini
*Counsel for Defendants-Appellants*

# Addendum A

JOHN W. SPIEGEL (SBN 78935)
john.spiegel@mto.com
JOHN M. GILDERSLEEVE (SBN 284618)
john.gildersleeve@mto.com
LAUREN C. BARNETT (SBN 304301)
lauren.barnett@mto.com
ROWLEY J. RICE (SBN 313737)
rowley.rice@mto.com
BRIAN R. BOESSENECKER (SBN 331409)
brian.boessenecker@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
Telephone:   (213) 683-9100
Facsimile:    (213) 687-3702

Attorneys for MATTEL, INC.,
MARGARET H. GEORGIADIS,
JOSEPH J. EUTENEUER,
and KEVIN FARR

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE MATTEL, INC. SECURITIES LITIGATION | Case No. 19-CV-10860-MCS (PLAx) |
| | **MATTEL DEFENDANTS' EX PARTE APPLICATION FOR LEAVE TO FILE SURREPLY TO ADDRESS NEW ARGUMENT AND EVIDENCE REGARDING PRICE IMPACT** |

1      The Mattel Defendants respectfully request leave to file a five-page surreply,

2  and reply declaration by Dr. J.B. Heaton, to address the extensive new evidence and

3  argument regarding price impact in Plaintiffs' reply in support of class certification.

4  The proposed filings are attached as Exhibits 1 and 2 to this Application.

5      Plaintiffs have advised that they oppose this request.

6  **Background**

7      In briefing the critical issue of whether the alleged misrepresentations "more

8  likely than not" affected Mattel's stock price, *Goldman Sachs Grp., Inc. v. Ark.*

9  *Teacher Ret. Sys.*, 141 S. Ct. 1951, 1963 (2021), Plaintiffs engaged in sandbagging.

10  On April 30, 2021, Plaintiffs moved for class certification based on the expert report

11  of Dr. S.P. Kothari, who stated that any opinions on price impact would come "in

12  my reply report." ECF No. 90-2 at 26 n.78. Plaintiffs held back argument and

13  evidence on price impact even though they surely anticipated Defendants would

14  oppose certification on that ground.[1] The parties stipulated to an extended schedule

15  that allowed for briefing this complex subject, with ten weeks for oppositions and

16  six weeks for Plaintiffs' reply.

17      On July 12, 2021, the Mattel Defendants (joined by all Defendants) opposed

18  class certification under *Goldman* and *Halliburton Co. v. Erica P. John Fund, Inc.*,

19  573 U.S. 258 (2014), on the ground that the alleged misrepresentations had no price

20  impact when made. ECF No. 93.

---

[1] *See* ECF No. 77 (Joint Rule 26(f) Rpt.) at 8 ("… Defendants are evaluating whether expert evidence will be required to determine whether a class may be certified, on topics including the impact (if any) of the alleged misstatements on Mattel's stock price for purposes of class certification …. Defendants respectfully submit that it would be most efficient for the Court to hear Plaintiffs' class certification motion after the Supreme Court issues its opinion in *Goldman Sachs* …."); *id.* at 2 ("Key legal issues include: (1) whether the putative class is entitled to a presumption of reliance at the class certification stage under *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) …").

On August 23, 2021, Plaintiffs filed a 20-page reply[2] with 14 exhibits, one of which is a 186-paragraph "Reply Report" by Dr. Kothari (with its own 6 exhibits). ECF No. 120.  The Reply Report newly presents Dr. Kothari's "empirical analysis" and "additional qualitative and quantitative analysis" with respect to price impact. ECF No. 120-2 at 3.  It includes, among other things, a new event study and related analyses (*e.g.*, *id.* Ex. 2) and opinions based on internal Mattel and PwC documents not addressed in prior briefing (*e.g.*, *id.* at 46-47).  In addition, Plaintiffs' reply brief makes new legal arguments with respect to price impact that cannot be reconciled with the Supreme Court's recent decision in *Goldman*.

## A Surreply Is Warranted

The Court has discretion to consider a surreply.  Indeed, the Court has exercised that discretion previously in this case in considering Plaintiffs' surreply in opposition to Defendants' motions to dismiss.  ECF No. 74 at 2 ("The Court, in its discretion, grants Plaintiffs' Surreply Motion and considers the brief attached thereto.").

"[W]here new evidence is presented in a reply … the district court should not consider the new evidence without giving the non-movant an opportunity to respond."  *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (quotation marks and brackets omitted); *see, e.g.*, *Henderson v. Bonaventura*, 649 F. App'x 639, 642 (9th Cir. 2016) ("The district court erred by considering these arguments after Appellees raised them in their reply brief and without giving Henderson an opportunity to respond.") (citing *Provenz*, 102 F.3d at 1483); *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 559 n.87 (C.D. Cal. 2014) ("In general, a court will not

---

[2] Defendants consented to a 20-page reply because the Mattel Defendants and PwC filed separate oppositions, but predicted "that Lead Plaintiffs in that brief will raise new arguments and present new evidence regarding price impact under *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951 (2021)."  ECF No. 102. As predicted, the first 17.5 pages of Plaintiffs' 20-page reply address price impact, even though it was addressed in only one of the two oppositions.

consider evidence submitted for the first time in reply without giving the opposing party an opportunity to respond.") (citing *Provenz*, 102 F.3d at 1483).  As Plaintiffs told this Court, "the Ninth Circuit has recognized that a litigant must also have the opportunity to respond to new evidence raised in a reply brief."  ECF No. 67 at 2 (citing *Provenz*, 102 F.3d at 1483); *see* V. Phillips & K. Stevenson, *Rutter Grp. Prac. Guide: Fed. Civ. Proc. Before Trial* § 12.107.1 (2021) ("Moreover, if the court relies on new material contained in a reply brief, it *must* afford the opposing party a reasonable opportunity to respond.").[3]

Because Plaintiffs introduced substantial new evidence and made new legal and factual arguments on reply, the Mattel Defendants would be unfairly prejudiced if not afforded the opportunity to respond.  The core opinions of Plaintiffs' expert, including admittedly new "empirical analysis" and "qualitative and quantitative analysis," ECF No. 120-2 at 3, would be shielded from meaningful scrutiny.  Those opinions concern the core contested issue on this motion: the presence or absence of price impact.  Moreover, the reply makes new arguments regarding price impact that conflate price impact with loss causation and discount non-empirical evidence, all in violation of the Supreme Court's decision in *Goldman*.  The reply and Dr. Kothari's Reply Report also rely on internal documents not discussed in any prior briefing. *E.g.*, ECF No. 120 at 12, 14-15; ECF No. 120-2 at 46-47.

---

[3] *See also, e.g.*, *Holt v. U.S. Bank Nat'l Ass'n*, 2019 WL 9341318, at *2 (C.D. Cal. Mar. 26, 2019) ("Courts can 'mitigate' the 'unfairness' caused by new evidence submitted by 'granting the objecting party leave to file a sur-reply opposition to the new matter.'") (quoting *Dutta v. State Farm Mut. Auto. Ins. Co.*, 895 F.3d 1166, 1172 (9th Cir. 2018)); *WB Music Corp. v. Royce Int'l Broad. Corp.*, 2018 WL 2121819, at *1-2 (C.D. Cal. May 7, 2018) ("[T]he Court finds the Reply contains new evidence not introduced in their Motion or addressed in Defendants' Opposition.  Accordingly, the Court GRANTS Defendants' ex parte application and considers their sur-reply [].");  *SEC v. Heart Tronics, Inc.*, 2015 WL 13375687, at *2 (C.D. Cal. Aug. 3, 2015) ("[T]he Court must permit Gault to file his sur-reply if it is to consider the new facts and argument in the SEC's reply.  Gault's ex parte application is GRANTED.").

Finally, the Supreme Court's direction two months ago to conduct a thorough, holistic inquiry into price impact counsels against allowing Plaintiffs to submit unrebutted price impact evidence on reply. *See Goldman*, 141 S. Ct. at 1960-61, 1963. *Goldman* reflects "new ideas" and "clarifications of the legal standard" by the Supreme Court that call for full briefing on this important motion implicating an evolving area of the law. *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, __ F.4th __, 2021 WL 3776297, at *4 (2d Cir. Aug. 26, 2021).[4]

Dated:  September 2, 2021

Respectfully submitted,

MUNGER, TOLLES & OLSON LLP

By: _____ */s/ John W. Spiegel* _____
          JOHN W. SPIEGEL

Attorneys for MATTEL, INC.,
MARGARET H. GEORGIADIS,
JOSEPH J. EUTENEUER,
and KEVIN FARR

---

[4] In accordance with Local Civil Rule 7-19, the name, address, telephone number and e-mail address of counsel for Plaintiffs is: John Rizio-Hamilton, Esq., Bernstein Litowitz Berger & Grossmann LLP, 1251 Avenue of the Americas, New York, NY 10020, (212) 554-1400, johnr@blbglaw.com.

-4-

MATTEL DEFENDANTS' EX PARTE APPLICATION FOR LEAVE TO FILE SURREPLY
TO ADDRESS NEW ARGUMENT AND EVIDENCE REGARDING PRICE IMPACT

# Addendum B

1
2
3
4
5
6
7
8  UNITED STATES DISTRICT COURT
9  CENTRAL DISTRICT OF CALIFORNIA
10

| 11 | IN RE MATTEL, INC. SECURITIES LITIGATION | Case No. 19-CV-10860-MCS (PLAx) |
| 12 | | **ORDER GRANTING EX PARTE APPLICATION FOR LEAVE TO FILE SURREPLY TO ADDRESS NEW ARGUMENT AND EVIDENCE REGARDING PRICE IMPACT (ECF No. 131)** |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |

17
18
19
20
21
22
23
24
25
26
27
28

1       Upon consideration of the Mattel Defendants' Ex Parte Application for Leave
2  to File Surreply to Address New Argument and Evidence Regarding Price Impact
3  ("Application") and any opposition thereto, and good cause shown, IT IS HEREBY
4  ORDERED that the Mattel Defendants' Application is GRANTED.  The
5  Defendants shall file Exhibits 1 and 2 to the Application. Plaintiffs may file a
6  response not to exceed four (4) pages that is strictly confined to rebuttal of Exhibits
7  1 and 2 of the Application by September 15, 2021.

8

9  DATED:  September 9, 2021

                           HONORABLE MARK C. SCARSI

10                        UNITED STATES DISTRICT JUDGE

# Addendum C

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| *In re EQT Corporation Securities Litigation* | )<br>)<br>)   2:19-cv-00754-RJC<br>)<br>)<br>)<br>)<br>) |

## <u>ORDER OF COURT</u>

AND NOW, this 7th day of July, 2021, upon consideration of Plaintiffs' Motion for Leave to File a Rebuttal Expert Report in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel (ECF No. 159) and Defendants' Motion to Extend Deadlines for Class Certification Discovery and Amend the Case Management Order (ECF No. 162), it hereby ORDERED that Plaintiffs' Motion is granted and Defendants' Motion is granted in part and denied in part as follows:

1. The parties shall complete class certification discovery by **<u>July 30, 2021.</u>**

2. Plaintiffs may file a rebuttal expert report, limited to the issues discussed in their Motion for Leave and the Declaration of Steven P. Feinstein, Ph.D., CFA (ECF No. 161), by **<u>July 20, 2021.</u>**

3. Depositions of all experts, including a second deposition of Dr. Feinstein, shall take place on or before **<u>July 30, 2021.</u>**  The deposition of Defendants' expert shall occur after the filing of Plaintiffs' rebuttal expert report.  At both Dr. Feinstein's and Dr. Lehn's depositions, either party may inquire as to matters and opinions set forth in Dr. Feinstein's rebuttal expert report.

4. Plaintiffs shall file their reply in support of class certification by **<u>August 6, 2021.</u>**

5. In light of the above, the Court denies Defendants' request to file a rebuttal expert report. Defendants may, however, file a surreply in opposition to class certification, limited to ten (10) pages, by **August 13, 2021** addressing what Defendants believe are new opinions presented in Plaintiffs' rebuttal report.

6. All other outstanding deadlines set forth in the Court's May 6, 2021 First Amended Case Management Order (ECF No. 145) and not addressed herein remain in full force and effect.

7. Following the July 30, 2021 deadline for completion of class certification discovery, and pending the Court's resolution of Plaintiffs' Motion for Class Certification, any party may seek a protective order regarding the deadlines imposed by the Court's First Amended Case Management Order to the extent that party feels particularly aggrieved by any perceived burden imposed by outstanding or subsequently-served merits-based fact discovery requests or to the extent that the party believes that the interests of judicial economy warrant relief from such discovery requests pending the Court's resolution of Plaintiffs' Motion for Class Certification.

BY THE COURT:

s/*Robert J. Colville*
Robert J. Colville
United States District Judge

cc/ecf: All counsel of record

# Addendum D

WACHTELL, LIPTON, ROSEN & KATZ

MARTIN LIPTON
HERBERT M. WACHTELL
THEODORE N. MIRVIS
EDWARD D. HERLIHY
DANIEL A. NEFF
ANDREW R. BROWNSTEIN
MARC WOLINSKY
STEVEN A. ROSENBLUM
JOHN F. SAVARESE
SCOTT K. CHARLES
JODI J. SCHWARTZ
ADAM O. EMMERICH
RALPH M. LEVENE
RICHARD G. MASON
DAVID M. SILK
ROBIN PANOVKA
DAVID A. KATZ
ILENE KNABLE GOTTS
JEFFREY M. WINTNER
TREVOR S. NORWITZ
BEN M. GERMANA
ANDREW J. NUSSBAUM
RACHELLE SILVERBERG

STEVEN A. COHEN
DEBORAH L. PAUL
DAVID C. KARP
RICHARD K. KIM
JOSHUA R. CAMMAKER
MARK GORDON
JOSEPH D. LARSON
JEANNEMARIE O'BRIEN
WAYNE M. CARLIN
STEPHEN R. DiPRIMA
NICHOLAS G. DEMMO
IGOR KIRMAN
JONATHAN M. MOSES
T. EIKO STANGE
JOHN F. LYNCH
WILLIAM SAVITT
ERIC M. ROSOF
GREGORY E. OSTLING
DAVID B. ANDERS
ANDREA K. WAHLQUIST
ADAM J. SHAPIRO
NELSON O. FITTS
JOSHUA M. HOLMES

51 WEST 52ND STREET
NEW YORK, N.Y. 10019-6150

TELEPHONE: (212) 403-1000
FACSIMILE: (212) 403-2000

GEORGE A. KATZ (1965-1989)
JAMES H. FOGELSON (1967-1991)
LEONARD M. ROSEN (1965-2014)

OF COUNSEL

MARTIN J.E. ARMS
MICHAEL H. BYOWITZ
KENNETH B. FORREST
SELWYN B. GOLDBERG
PETER C. HEIN
MEYER G. KOPLOW
LAWRENCE S. MAKOW
DOUGLAS K. MAYER
PHILIP MINDLIN
DAVID S. NEILL
HAROLD S. NOVIKOFF
LAWRENCE B. PEDOWITZ

ERIC S. ROBINSON
PATRICIA A. ROBINSON*
ERIC M. ROTH
PAUL K. ROWE
DAVID A. SCHWARTZ
MICHAEL J. SEGAL
ELLIOTT V. STEIN
WARREN R. STERN
PAUL VIZCARRONDO, JR.
PATRICIA A. VLAHAKIS
AMY R. WOLF

DAVID E. SHAPIRO
DAMIAN G. DIDDEN
IAN BOCZKO
MATTHEW M. GUEST
DAVID E. KAHAN
DAVID K. LAM
BENJAMIN M. ROTH
JOSHUA A. FELTMAN
ELAINE P. GOLIN
EMIL A. KLEINHAUS
KARESSA L. CAIN
RONALD C. CHEN
GORDON S. MOODIE
DONGJU SONG
BRADLEY R. WILSON
GRAHAM W. MELI
GREGORY E. PESSIN
CARRIE M. REILLY
MARK F. VEBLEN
VICTOR GOLDFELD
EDWARD J. LEE
BRANDON C. PRICE
KEVIN S. SCHWARTZ

MICHAEL S. BENN
SABASTIAN V. NILES
ALISON ZIESKE PREISS
TIJANA J. DVORNIC
JENNA E. LEVINE
RYAN A. McLEOD
ANITHA REDDY
JOHN L. ROBINSON
JOHN R. SOBOLEWS
STEVEN WINTER
EMILY D. JOHNSON
JACOB A. KLING
RAAJ S. NARAYAN
VIKTOR SAPEZHNIKO
MICHAEL J. SCHOBE
ELINA TETELBAUM
ERICA E. BONNETT
LAUREN M. KOFKE
ZACHARY S. PODOLSKY
RACHEL B. REISBER
MARK A. STAGLIANO

* ADMITTED IN THE DISTRICT OF COLUMBIA

COUNSEL

DAVID M. ADLERSTEIN
SUMITA AHUJA
AMANDA K. ALLEXON
LOUIS J. BARASH
OLIVER J. BOARD
FRANCO CASTELLI
ANDREW J.H. CHEUNG
PAMELA EHRENKRANZ
KATHRYN GETTLES-ATWA

ADAM M. GOGOLAK
NANCY B. GREENBAUM
MARK A. KOENIG
J. AUSTIN LYONS
ALICIA C. McCARTHY
PAULA N. RAMOS
NEIL M. SNYDER
S. CHRISTOPHER SZCZERBAN
JEFFREY A. WATIKER

**MEMO ENDORSED**

March 9, 2020

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/10/20

**BY ECF AND BY HAND**

The Honorable Louis L. Stanton
United States District Judge
U.S. District Court, Southern District of New York
500 Pearl Street
New York, NY 10007

> Re:   In re Grupo Televisa Securities Litigation,
> No. 18 Civ. 1979 (LLS)

Dear Judge Stanton:

    We write on behalf of Defendants to request permission to file a sur-reply brief and, with respect to the Rule 23(b) price-impact issue, for an evidentiary hearing in connection with Plaintiff's motion for class certification.

    We received Friday night, March 6, 2020, Plaintiff's reply brief, responding to Defendants' opposition to class certification filed on January 15. Plaintiff's reply brief is *double* the length of its opening brief, relies on *two* new expert reports and *two* new affidavits, and is the first time Plaintiff has attempted to address the salient issues that the Court must resolve on this motion: principally whether the alleged misrepresentations had a price impact and the

The Honorable Louis L. Stanton
March 9, 2020
Page 2

consequence of Plaintiff's short position held through its majority-owned fund. Given that Defendant's previous brief was *de facto* the opening brief on these issues and Defendants have had no prior opportunity to respond to Plaintiff's claims, it is respectfully requested that Defendants be afforded the opportunity to file a sur-reply brief on both such issues. Defendants further suggest an evidentiary hearing on the price-impact issue.

As to Rule 23(b), Plaintiff's reply offers a new report by its expert, Dr. Feinstein, which now claims for the first time that there was a price movement that was (barely) statistically significant on certain of Plaintiff's claimed corrective disclosure dates. As we are prepared to show in a sur-reply brief, Dr. Feinstein's approach is fatally flawed. But more to the point for present purposes, Dr. Feinstein's new analysis makes permitting a sur-reply and a hearing especially appropriate here: Plaintiff came forth with this expert report for the first time in its reply brief, and we respectfully submit that it would benefit the Court to have a full explication of this issue.

In the wake of the Supreme Court's decision in *Halliburton II* — reiterating that the presumption of reliance is rebuttable by defendants at the class certification stage — courts in this Circuit routinely permit sur-replies and conduct evidentiary hearings where the issue of price impact is in dispute. *See, e.g.*, Order Granting Leave to File Sur-reply, *In re Chi. Bridge & Iron N.V. Sec. Litig.*, No. 17 Civ. 1580 (S.D.N.Y. Jan. 23, 2019) (Scheindlin, Special Master), ECF No. 171; Order Granting Leave to File Sur-reply, *In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 Civ. 3461(S.D.N.Y. June 8, 2015) (Crotty, J.), ECF No. 158; *Strougo* v. *Barclays PLC*, No. 14 Civ. 5797, (S.D.N.Y. Nov. 30, 2015) (Scheindlin, J.), ECF Nos. 70, 76 (granting defendants' motion for class certification evidentiary hearing and holding such evidentiary hearing); *see also* Order Granting Leave to File Sur-reply, *In re Finisar Corp. Sec. Litig.*, No. 11 Civ. 1252 (N.D. Cal. Nov. 17, 2017), ECF Nos. 147, 150, 187 (concluding that defendants had proved the absence of price impact by a preponderance of the evidence following an evidentiary hearing in the district court).

Indeed, the Second Circuit in *Arkansas Teachers* v. *Goldman Sachs Grp., Inc.*, 879 F.3d 474, 485 (2d Cir. 2018), in recently clarifying that a normal preponderance of the evidence standard applies to the price-impact issue, specifically encouraged the district court there to hold an evidentiary hearing upon remand. Likewise, a sur-reply and evidentiary hearing are appropriate in this case.

Nevertheless, while Defendants believe that an evidentiary hearing is desirable before the Rule 23(b) issue can be resolved, it may ultimately be unnecessary to reach that price-impact issue. As this Court has recognized in its February 6, 2020 order, "if CAAT received more from shorting Grupo shares than it lost on its long position," determination of other issues "may become immaterial." It is submitted that, as to the short position — which, again, was not discussed in Plaintiff's opening brief — the issue is readily determinable without the need of an evidentiary hearing. Plaintiff's reply does not deny that CAAT in fact gained more from the short position than it lost on the long position and that it was aware of the magnitude of this position when it filed its original motion papers. Plaintiff now responds only by making a legal

The Honorable Louis L. Stanton
March 9, 2020
Page 3

argument that the short position is supposedly irrelevant and offers a new "expert" report on the subject and two new affidavits. Defendants believe that Plaintiff's argument and new "evidence" are unavailing, as will be addressed in a sur-reply brief, if permitted.

Accordingly, it is respectfully submitted that Defendants should be afforded the opportunity to respond to Plaintiff's new arguments and new evidence so the Court can decide whether an evidentiary hearing on the Rule 23(b) issue is necessary to resolve the class certification motion or whether Plaintiff has failed to satisfy Rule 23(a), rendering determination of that Rule 23(b) issue unnecessary. In terms of timing, Defendants have noticed a deposition of Plaintiff's expert Dr. Feinstein next Friday, March 20 (the first available date after consultation with Plaintiff's counsel regarding all parties' schedules). If acceptable to the Court, Defendants would intend to submit their sur-reply the following week, on Friday, March 27 (recognizing that a transcript may not be available until March 23). If there is to be an evidentiary hearing addressing the price-impact issue, Defendants would then be prepared for such evidentiary hearing at whatever date is acceptable to the Court

*So Ordered*

*Louis L. Stanton*

*3/10/20*

We are available for a conference to discuss these matters further at the Court's convenience should the Court so desire. We thank the Court for its consideration of this request.

Very respectfully submitted,

Herbert M. Wachtell
51 West 52nd Street
New York, New York 10019
(212) 403-1000
hmwachtell@wlrk.com

cc: All Counsel of Record

# Addendum E

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, NY 10004-2498*

May 28, 2015

*By ECF and Hand Delivery*
The Honorable Paul A. Crotty,
    U.S. District Court for the Southern District of New York,
       500 Pearl Street,
          New York, New York  10007.

      Re:   *In re Goldman Sachs Group, Inc. Sec. Litig.,* Master File No. 1:10-cv-03461-PAC

Dear Judge Crotty:

           On behalf of Defendants, I write to request a short evidentiary hearing, with

testimony from the parties' economics and finance experts, and oral argument in connection with

Plaintiffs' Motion for Class Certification (Dkt. No. 135).  To the extent that the Court deems

Defendants' request to require a motion, Defendants respectfully request a pre-motion

conference pursuant to Rule 3(D) of Your Honor's Individual Practices.  Plaintiffs do not oppose

oral argument of the motion, but oppose the holding of an evidentiary hearing.

           "[D]enying or granting class certification is often the defining moment in class

actions (for it may sound the 'death knell' of the litigation on the part of plaintiffs, or create

unwarranted pressure to settle nonmeritorious claims on the part of defendants)." *Newton* v.

*Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 162 (3d Cir. 2001).  "[T]here can be

no doubt that it is proper for a district court, prior to certification of a class … to conduct

hearings to determine whether the prerequisites of Rule 23 are satisfied." *Sirota* v. *Solitron*

*Devices, Inc.*, 673 F.2d 566, 571 (2d Cir. 1982).[1]

           This is a paradigmatic case where an evidentiary hearing will assist the Court in

determining whether to certify a class.  Four economics and finance experts have submitted 249

---

[1] *See St. Stephen's Sch.* v. *PricewaterhouseCoopers Accountants N.V.*, 570 F. App'x 37, 39 (2d Cir. 2014) (vacating certification where court did not "provide sufficient factual findings" that plaintiffs "affirmatively demonstrate[d]" compliance with Rule 23); MANUAL FOR COMPLEX LITIGATION § 21.21 (4th ed. 2004) (evidentiary hearing "is a routine part of the certification decision" that "ensures a full record").

The Honorable Paul A. Crotty                                                                                    -2-

pages of detailed reports (together with 135 separate exhibits and appendices) and given 1,228

pages of deposition testimony.  The experts address the central disputed issue before the Court

on class certification: whether Goldman Sachs' statements concerning its business principles and

conflicts management impacted the Firm's stock price, either when made or when the "truth"

supposedly was revealed.  *See Halliburton Co.* v. *Erica P. John Fund, Inc.*, 134 S. Ct. 2398,

2417 (2014) (on class certification, defendants can seek to rebut *Basic* presumption of reliance

by showing alleged misstatements "did not actually affect the market price of the stock").

A hearing also would permit Defendants to respond to the 72-page

"supplemental" second report of Plaintiffs' expert, Dr. John Finnerty, which far exceeded the

length of his 47-page initial report.  Dr. Finnerty's supplemental report contained new opinions,

including for the first time on price impact, to which Defendants have had no opportunity to

respond.[2]  At the hearing, Dr. Paul Gompers of the Harvard Business School will demonstrate

that Goldman Sachs' statements regarding its business principles and conflicts management, and

subsequent purported "corrections," had no impact on Goldman Sachs' stock price.[3]  Dr. Stephen

---

[2] To the extent that the Court declines to hold an evidentiary hearing, Defendants respectfully request leave to submit a 10-page surreply brief, responsive expert declarations, and relevant portions of their experts' testimony that Plaintiffs elected not to submit.  *See Kowalski* v. *YellowPages.com, LLC*, No. 10-cv-7318, 2012 WL 1097350, at *10 (S.D.N.Y. Mar. 31, 2012) (Gardephe, J.) ("Where new evidence is presented in a party's reply brief or affidavit in further support of its [] motion, the district court should permit the nonmoving party to respond to the new matters prior to the disposition of the motion." (quotation marks omitted)).

[3] Tellingly, Plaintiffs offer only speculation to support their assertion that Goldman Sachs' statements about its business principles and conflicts management had a price impact (*see, e.g.*, Finnerty Reb. ¶¶ 202-06).  The need to establish such an impact is particularly critical in the context of the Second Circuit's holdings, reiterated today, that "'explicitly aspirational' statements," including about internal controls, are "'too general to cause a reasonable investor to rely upon them.'"  *Teamsters Local 710 Pension Fund* v. *Gen. Motors Co.*, No. 14-3770-cv (2d Cir. May 28, 2015), slip op. at 3 (quoting *City of Pontiac Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (bank's statements about legal compliance and risk concentration controls "too general to cause a reasonable investor to rely on them" as a matter of law)).

The Honorable Paul A. Crotty                                                                                    -3-

Choi of NYU will show that the stock price declines were consistent with expected declines

resulting from the public announcement of an SEC enforcement action (as opposed to news of

the underlying allegations).

    Courts in this District have held evidentiary hearings involving experts where, as

here, class certification requires resolution of disputed issues of expert evidence.  For example,

in *IBEW* v. *Deutsche Bank A.G.*, Judge Forrest ordered a hearing and heard live testimony to

gauge the experts' "credib[ility]," "consisten[cy]," "responsive[ness]," and "quality and depth of

reasoning."  2013 WL 5815472, at *7, *10 (S.D.N.Y. Oct. 29, 2013).[4]  In this case, the

evidentiary hearing would allow the Court to hear from the experts in their own words and to

question them about what are complex financial and economic concepts.  The hearing would also

allow for Defendants and their experts to respond to the arguments and theories newly raised by

Plaintiffs and their expert on Reply.  To assist the Court, Defendants' presentation would

highlight, through the visual display of record and demonstrative exhibits, the most important

materials in what is a large record.  We have enclosed a proposed schedule for the hearing and

argument for the Court's consideration.

             Respectfully submitted,

             Richard H. Klapper

cc:  Counsel of Record

---

[4] *See also Lerner* v. *Office of the Comm'r of Baseball*, No. 12-cv-3704, Dkt. No. 419 (S.D.N.Y.
Mar. 15, 2015) (Scheindlin, J.) (three-day evidentiary hearing with four experts and arguments
by counsel); *Adkins* v. *Morgan Stanley*, No. 12-cv-7667, Dkt. No. 217 (S.D.N.Y. Feb. 24, 2015)
(Caproni, J.) (ordering evidentiary hearing); *Chen-Oster* v. *Goldman, Sachs & Co.*, No. 10-cv-
6950, Dkt. No. 334 (S.D.N.Y. Oct. 1, 2014) (Francis, M.J.) (three-day evidentiary hearing with
two experts and arguments by counsel); *George* v. *China Auto Sys., Inc.*, 2013 WL 3357170, at
*9 (S.D.N.Y. July 3, 2013) (Forrest, J.) ("evidentiary hearing was particularly useful" on class
certification motion "to assist the Court in understanding the parties' analyses and to assess the
credibility of the analytical work"); *In re Fed. Home Loan Mortg. Corp. Sec. Litig.*, 281 F.R.D.
174, 175 (S.D.N.Y. 2012) (Cedarbaum, J.) (holding "evidentiary hearing" with experts).

**Proposed Schedule for Evidentiary Hearing**

**Day One**

9:30 – 10:30 a.m. – Plaintiffs' Opening Argument on Class Certification Motion

10:30 – 11:30 a.m. – Defendants' Opening Argument on Class Certification Motion

11:30 – 11:45 a.m. – Break

11:45 – 12:45 p.m. – Direct of Plaintiffs' Expert

12:45 – 2:00 p.m. – Lunch Break

2:00 – 3:00 p.m. – Cross of Plaintiffs' Expert

3:00 – 3:10 p.m. – Re-direct of Plaintiffs' Expert

3:10 – 3:20 p.m. – Re-cross of Plaintiffs' Expert

3:20 – 3:30 p.m. – Break

3:30 – 4:30 p.m. – Direct of Defendants' First Expert

**Day Two**

9:30 – 10:30 a.m. – Cross of Defendants' First Expert

10:30 – 10:40 a.m. – Re-direct of Defendants' First Expert

10:40 – 10:50 a.m. – Re-cross of Defendants' First Expert

10:50 – 11:00 a.m. – Break

11:00 – 12:00 p.m. – Direct of Defendants' Second Expert

12:00 – 1:00 p.m. –– Cross of Defendants' Second Expert

1:00 – 2:10 p.m.–– Lunch Break

2:10 – 2:20 p.m. – Re-direct of Defendants' Second Expert

2:20 – 2:30 p.m. – Re-cross of Defendants' Second Expert

2:30 – 3:10 p.m. – Plaintiffs' Summation

3:10 – 3:20 p.m. – Break

3:20 – 4:00 p.m. – Defendants' Summation

# Addendum F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 8, 2015
```

---------------------------------------------------------X
:
IN re GOLDMAN SACHS GROUP, INC.          :
SECURITIES LITIGATION                    :        10 Civ. 3461 (PAC)
:
:
:        **ORDER**
:
:
---------------------------------------------------------X

     The Court is in receipt of the parties' letters of May 28, 2015 and June 2, 2015.

Defendants have requested oral argument and a two-day evidentiary hearing on Plaintiffs'

motion for class certification.  Defendants have also requested leave to submit a 10-page surreply

brief, responsive expert declarations, and "relevant portions of their experts' testimony that

Plaintiffs elected not to submit."  Plaintiffs oppose the request for an evidentiary hearing and the

request to submit supplemental papers.

     Defendants' requests for an evidentiary hearing and oral argument are denied.

Defendants' request for leave to file surreply papers in granted in part.  Defendants may submit a

5-page responsive brief, a 10-page responsive expert declaration, and any testimony necessary to

ensure that the record is complete.

Dated: New York, New York
      June 8, 2015

                                     SO ORDERED

                                _____

                                PAUL A. CROTTY
                                United States District Judge

# Addendum G

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re BP p.l.c. Securities Litigation | MDL No. 2185 |
| | Civil Action No. 4:10-md-02185 |
| | Hon. Keith P. Ellison |

## DEFENDANTS' MOTION FOR LEAVE TO FILE SUR-REPLY IN FURTHER OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Defendants respectfully submit this Motion for Leave to File Sur-Reply in Further Opposition to Plaintiffs' Motion for Class Certification.

1.      Defendants seek leave to file a short 15-page sur-reply (attached hereto as Exhibit A) in further opposition to Plaintiffs' class certification motion to respond to new arguments raised for the first time in Plaintiffs' Reply Memorandum of Law in Support of Plaintiffs' Motion for Class Certification.

2.      Defendants are mindful of the Court's admonition against the filing of sur-replies as a routine matter and are not attempting to have the last word on every point.  Defendants' sur-reply instead addresses only the following arguments:

- In their opening papers, Plaintiffs made no attempt to present a methodology for calculating damages on a classwide basis.  They instead waited until their reply to disclose for the first time how they propose to calculate damages in this case.  In an attempt to justify their new damages methodology, Plaintiffs also advance on reply a new "one fraud" theory of liability.

- On reply, Plaintiffs abandon their allegations that the challenged statements in BPXP's OSRP and IEP were made public in March and June 2009.  They instead

argue for the first time that Defendants' argument about the "publicity" of those MMS filings is an argument about materiality.

- The Ludlow Plaintiffs did not offer any justification for certifying a subclass in their opening papers.  On reply, they now attempt to shift their own burden under Rule 23 to Defendants.

- Plaintiffs address for the first time on reply the issues of whether (i) New York and Ohio profited from the alleged fraud and (ii) the unusual trading patterns of New York and Ohio render them atypical of the proposed Class.

3.     Plaintiffs have reserved the right to oppose this Motion.

4.     Defendants respectfully move for leave to file a sur-reply in opposition to Plaintiffs' Motion for Class Certification.  Defendants have attached a copy of their proposed sur-reply as Exhibit A.

Dated:         November 7, 2013

Respectfully submitted,

OF COUNSEL

Daryl A. Libow (pro hac vice)
Amanda F. Davidoff (pro hac vice)
Elizabeth A. Rose
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, D.C.  20006-5805
Telephone:  (202) 956-7500

Richard C. Pepperman, II (pro hac vice)
Marc De Leeuw (pro hac vice)
Matthew A. Peller
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000

*Attorneys for Defendants BP p.l.c., BP*
*America, Inc., BP Exploration and*
*Production, Inc., Anthony B. Hayward and*
*Douglas Suttles*

Theodore V. Wells, Jr. (pro hac vice)
Roberto Finzi (pro hac vice)
Jaren Janghorbani (pro hac vice)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000

*Attorneys for Defendant Douglas Suttles*

*/s/ Thomas W. Taylor*
Thomas W. Taylor
Texas State Bar No. 19723875
S.D. Tex. Bar No. 3906
ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, Texas  77002
Telephone:  (713) 220-4200
Facsimile:  (713) 220-4285
ttaylor@andrewskurth.com

*Attorney-in-Charge for Defendants*

-3-

## <u>CERTIFICATE OF CONFERENCE</u>

I hereby certify that counsel for BP has conferred by email with Plaintiffs' counsel, and Plaintiffs have reserved the right to oppose the relief sought in this Motion.

/s/  *Marc De Leeuw*
Marc De Leeuw

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing has been served by electronic CM/ECF filing on this 7th day of November 2013.

/s/  *Thomas W. Taylor*
Thomas W. Taylor

# Addendum H

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re BP p.l.c. Securities Litigation | MDL No. 2185 |
| | Civil Action No. 4:10-md-02185 |
| | Hon. Keith P. Ellison |

## <u>ORDER</u>

UNDER SUBMISSION this day was the Motion for Leave to File Sur-Reply in Further Opposition to Plaintiffs' Motion for Class Certification filed by Defendants BP p.l.c., BP America, Inc. and BP Exploration and Production, Inc. and Individual Defendants Anthony B. Hayward and Douglas Suttles (collectively, "Defendants").   Upon considering Defendants' motion, the Court is of the opinion that the Defendants' motion should be and hereby is:

GRANTED in all respects.

Signed this 8ᵗʰ day of November 2013.

Hon. Keith P. Ellison
UNITED STATES DISTRICT JUDGE